The **ATTORNEY GENERAL OF CANADA, Plaintiff–Appellant,**

v.

**R.J. REYNOLDS TOBACCO HOLD-INGS, INC., R.J. Reynolds Tobacco Co., R.J. Reynolds Tobacco International, Inc., RJR–MacDonald, Inc., R.J. Reynolds Tobacco Company, Puerto Rico, Northern Brands International, Inc., and Canadian Tobacco Manufacturers Council, Defendants–Appellees.**

Docket No. 00–7972.

United States Court of Appeals, Second Circuit.

Argued May 30, 2001.

Decided Oct. 12, 2001.

Philip S. Beck (Fred H. Bartlit, Jr., Jason L. Peltz, Lester C. Houtz, Christopher D. Landgraff, Karma M. Giulianelli, on the brief), Bartlit Beck Herman Palenchar & Scott, Chicago, IL; G. Robert Blakey, Notre Dame, IN; Robert A. Barrer, Hiscock & Barclay, LLP, Syracuse, NY, on behalf of Plaintiff–Appellant The Attorney General of Canada.

Jeffrey S. Sutton, Jones, Day, Reavis & Pogue, Columbus, OH; Timothy J. Finn, Christopher F. Dugan, Jones, Day, Reavis & Pogue, Washington, DC; Alan S. Burstein, Scolaro, Shulman, Cohen, Lawler & Burstein, P.C., Syracuse, NY, on behalf of Defendants–Appellees R.J. Reynolds Tobacco Holdings, Inc. and R.J. Reynolds Tobacco Co.

William C. Hendricks, III, King & Spalding, Washington, DC; Richard A. Schneider, King & Spalding, Atlanta, GA; Patricia A. Griffin & Danielle Sallah, King & Spalding, New York, NY, on behalf of Defendant–Appellee The Canadian Tobacco Manufacturers Council.

C. Stephen Heard, Jr. (Charles Sullivan, Kerry S. Sullivan, Edmund M. O'Toole, on the brief), Sullivan & Heard LLP, New York, NY, on behalf of Defendants–Appellees R.J. Reynolds Tobacco International, Inc., R.J. Reynolds Tobacco Company, PR, RJR–MacDonald, Inc., and Northern Brands International, Inc.

John J. Halloran, Jr. (Frank H. Granito, III, Frank H. Granito, Jr., Kenneth P. Nolan, on the brief), Speiser Krause Nolan & Granito, New York, NY; Kevin A. Malone & Carlos A. Acevedo, Krupnick Campbell Malone Roselli Buser Slama Hancock McNelis Liberman & McKee, Fort Lauderdale, FL; Andrew B. Sacks, Stuart H. Smith, John K. Weston, Sacks and Smith, L.L.C., New Orleans, LA, on behalf of Amicus Curiae The European Community.

Jan Amundson, National Association of Manufacturers, Washington, DC, Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, DC, Theodore B. Olson (Thomas G. Hungar, Jeffrey A. Wadsworth, on the brief), Gibson, Dunn & Crutcher LLP, Washington, DC, on behalf of Amici Curiae The National Association of Manufacturers and The United States Chamber of Commerce.

Before: CALABRESI and KATZMANN, Circuit Judges, and KAPLAN, District Judge.*

KATZMANN, Circuit Judge:

This action was brought by the Attorney General of Canada ("Canada") on behalf of the government of Canada for damages based on lost tax revenue and additional law enforcement costs. Canada alleges that these damages resulted from a scheme facilitated by defendants to avoid various Canadian cigarette taxes by smuggling cigarettes across the United States Canadian border for sale on the Canadian black market. Under the Racketeer Influenced and Corrupt Organizations Act

* The Honorable Lewis A. Kaplan of the United States District Court for the Southern District of New York, sitting by designation.

("RICO"), 18 U.S.C. § 1961 *et seq.*, Canada seeks revenue that it lost "from the evasion of tobacco duties and taxes," and from "[d]efendants' conduct [that] compelled [Canada] to rollback duties and taxes," as well as monies spent "seeking to stop the smuggling and catch the wrongdoers."

■ This case involves the construction of RICO in light of the common law doctrine known as the "revenue rule," a long established feature of the law of the United States and other nations including Canada, which holds that the courts of one sovereign will not enforce the tax judgments or claims of another sovereign. RICO broadly created a civil treble damages remedy for any person injured in its business or property by reason of a violation of the statute. Canada's action proceeds on the premise that the taxes it allegedly lost as a result of defendants' alleged RICO violations fall within RICO's damages provision. As the relief Canada seeks would be foreclosed by the revenue rule in the absence of RICO, and as there is no indication that Congress intended RICO to abrogate the revenue rule with respect to claims brought by foreign sovereigns under the statute, we have no choice but to conclude that RICO may not be used by Canada to seek recovery of lost tax revenues and tax enforcement costs as RICO damages. We therefore affirm. Although the judiciary can do no more, we note that Canada can seek recourse through the political branches—the executive and Congress.

## Background

Unless otherwise noted, the facts that follow are drawn from the complaint and Civil RICO Statement, the latter filed pursuant to Local Rule 9.2 of the Northern District of New York. On a motion to dismiss, the court must accept as true all of the factual allegations in the complaint, make inferences from those allegations in the light most favorable to plaintiff, and liberally construe the complaint. *See, e.g., Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001).

Defendants RJR–MacDonald ("RJR MacDonald"), a Canadian company, and American companies R.J. Reynolds Tobacco Holdings, Inc. ("Holdings"), Northern Brands International, Inc. ("NBI"), R.J. Reynolds Tobacco Company ("RJR US"), R.J. Reynolds Tobacco International, Inc. ("International"), and R.J. Reynolds Tobacco Company PR ("RJR PR") (collectively "defendants") manufactured and distributed cigarettes during the period relevant to this action. Defendant Canadian Tobacco Manufacturers Council is a trade association to which RJR–MacDonald belongs.

In 1991, Canada doubled its cigarette taxes, raising the average price of a carton of cigarettes from $26 (Canadian) in 1989 to $48 (Canadian) in 1991. After this tax increase, RJR–MacDonald's sales and market share declined. In order to decrease sales prices and increase consumption, defendants developed a scheme to avoid paying Canadian cigarette taxes. They exported cigarettes from Canada to the United States, and RJR–MacDonald falsely declared to Canadian officials that the cigarettes were not for consumption in Canada. Defendants then sold the cigarettes to distributors, whom defendants knew were smugglers, who resold the cigarettes to Canadian black-market distributors. At least some of the smuggling was conducted by selling the Canadian cigarettes to residents of the St. Regis/Akwesasne Indian Reservation ("Reservation") on the New York–Canadian border. The scheme was then refined to take advantage of the Foreign Trade Zones ("FTZs") in upstate New York. Defendants exported Canadian cigarettes from Canada to the

FTZs, where they were delivered to distributors who shipped the cigarettes to the Reservation. The distributors then smuggled the cigarettes back into Canada.

In 1992, Canada imposed a tax of $8 (Canadian) on each carton of exported cigarettes. To avoid this tax, defendants shipped raw Canadian tobacco to Puerto Rico, where RJR PR manufactured Canadian-style cigarettes made to look as if they had been made by RJR–MacDonald in Canada. These cigarettes were delivered directly or through Caribbean intermediaries to FTZs in New York, then brought to the Reservation to be smuggled into and sold in Canada. In 1992 and 1993, RJR PR manufactured approximately one billion Canadian-style cigarettes each year. RJR–MacDonald also employed Standard Commercial in North Carolina to process Canadian tobacco and package it as an RJR–MacDonald product. The tobacco was then smuggled into Canada for sale on the black market.

In 1993, in an effort to conceal their relationship with smugglers, defendants created NBI and directed their Canadian sales through it. Defendants' Canadian sales increased, and defendants made several hundred million dollars in profit. In 1994, Canada lowered its cigarette taxes. NBI liquidated its inventory at the FTZs by selling the cigarettes at low prices. Defendants continued their smuggling scheme at low levels between 1995 and 1998.

In conducting this scheme, defendants used the United States mails and wires to make payments and to place and receive orders. In 1997 and 1998, the United States indicted NBI and 21 individuals in connection with these smuggling activities. In 1998, NBI pled guilty to aiding and abetting the introduction of merchandise into the United States by means of false and fraudulent practices. Several individuals involved in the scheme pled guilty to crimes such as wire fraud, aiding and abetting smuggling, conspiring to defraud the United States, currency violations, money laundering and criminal RICO violations.

■ In the present action, Canada brings claims against defendants under RICO's civil enforcement provision. RICO is a broadly worded statute that "has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S.Rep. No. 91–617, at 76 (1969); *see* Statement of Findings and Purpose, Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922, 922–23 (1970). "RICO provides that '[a]ny person injured in his business or property by reason of' a RICO violation may bring a civil action to recover treble damages." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992) (quoting 18 U.S.C. § 1964(c)), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute ...; (2) an injury to business or property; and (3) that the injury was caused by the violation of [RICO]." *De Falco v. Bernas*, 244 F.3d 286, 305 (2d Cir.2001) (internal quotation marks and citation omitted), *cert. denied*, —— U.S. ——, 122 S.Ct. 207, —— L.Ed.2d —— (2001). Canada alleges that defendants violated RICO by "conduct[ing] or participat[ing] ... in the conduct of [an] enterprise's affairs through a pattern of racketeering activity," namely repeated instances of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1962(c). Second, Canada alleges a conspiracy, in violation of 18 U.S.C. § 1962(d), to violate subsections (a), (b)

and (c) of section 1962.[1] Canada explains that these RICO violations were the proximate cause of injury to its "property" because it was deprived of revenue from tobacco duties and taxes and was forced to spend money to stop defendants' illegal activity.

Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). In a thorough and thoughtful opinion, the district court rejected some of the grounds of defendants' motion, finding that Canada is a "person" entitled to bring a RICO action and refusing to dismiss the action under the act-of-state and political-question doctrines. *See Attorney General of Canada v. RJ Reynolds Tobacco Holdings, Inc.*, 103 F.Supp.2d 134, 144–50 (N.D.N.Y.2000). Nonetheless, the district court granted the motion to dismiss because it held that Canada's lost revenue claims were barred by the revenue rule; that a government's claim for damages based on increased law enforcement and related costs does not satisfy civil RICO's requirement that the plaintiff suffer an injury to its commercial interests; and that RICO does not provide for the disgorgement and other equitable relief requested by Canada. *See id.* at 140–44, 150–55. With regard to the revenue rule, the district court explained:

> Recognizing the existence of the Revenue Rule ... only begs the impending question—whether the instant civil RICO claim commenced by Canada is precluded by that rule.

> \*　　\*　　\*　　\*　　\*　　\*

> The problem arises when we look back to the standing and recovery requirements of a claim under 18 U.S.C. § 1964(c) and, in particular, the require-

ment that a civil RICO plaintiff allege injury to business or property.

\*　　\*　　\*　　\*　　\*　　\*

Again, to have standing and to recover, Canada must allege injury in fact, which ultimately obligates it to prove that some act or acts in furtherance of the scheme caused it to sustain injury.

\*　　\*　　\*　　\*　　\*　　\*

Certain of the types of injuries alleged by Canada, namely lost revenues resulting from the evasion of duties and taxes, require it to show that the scheme utilizing the mails and wire communications to defraud it out of tax revenue was successful (at least, in part, insofar as it actually evaded Canadian tax laws thereby causing Canada to lose revenue).... Thus, to pursue its claim for damages relating to lost tax revenue, Canada will have to prove, and the Court will have to pass on, the validity of the Canadian revenue laws and their applicability hereto and the Court would be, in essence, enforcing Canadian revenue laws. Enforcing foreign revenue laws is precisely the type of meddling in foreign affairs the Revenue Rule forbids.

\*　　\*　　\*　　\*　　\*　　\*

The fact that the executive branch of the United States Government has seen fit to enter into treaties with Canada with respect to the recognition and enforcement of certain tax liabilities, to delineate the extent to which one country's revenue claims may be enforced in the other, and to limit such enforcement to "finally determined" revenue claims, strongly suggests that Canada's RICO claim would draw this Court's "inquiry into forbidden waters reserved exclusively to the legislative and executive

---

1. Subsection (a) bars the use or investment of racketeering-derived funds in an enterprise engaged in or affecting interstate or foreign commerce, while subsection (b) bars the acquisition or maintenance of an interest in such an enterprise through racketeering.

branches of our government." As long as the Revenue Rule prevails (as evidenced by Second Circuit precedent and the Treaty), this Court is precluded from affording the Canadian government an alternative mechanism not expressly authorized by the legislative and/or executive branches of government—those branches particularly responsible for establishing and conducting international relations—by which it may recoup lost tax revenues in the courts of the United States.

*Id.* at 141–44 (internal citations and footnote omitted).

Canada appeals the dismissal, arguing that the revenue rule is inapplicable, that it adequately pled the elements of a civil RICO cause of action and is not required to show a commercial injury, and that equitable relief is available, particularly where, as here, the amount of damages may be difficult to prove. Defendants oppose the appeal, arguing that the revenue rule precludes an action for the enforcement of foreign tax claims, that the political-question doctrine bars this action, that Canada failed to plead the commercial injury required by RICO and is not a "person" under RICO entitled to bring the action, and that equitable remedies are unavailable in a civil RICO suit such as this. *Amicus curiae* the European Community urges reversal of the district court, primarily on the ground that the revenue rule is inapplicable and inconsistent with the goals of RICO. *Amici curiae* the National Association of Manufacturers and the United States Chamber of Commerce advocate affirmance, arguing that the revenue rule requires the Court to limit foreign governments' use of United States courts for tax collections, which, if unrestricted, would be harmful to American business interests.

We find that the present case falls within the revenue rule's proscriptions. Moreover, we have found no evidence that Congress intended to limit the revenue rule when it enacted RICO. Canada requests that a United States court enforce Canadian tax laws on its behalf. This we cannot do, notwithstanding our deep respect for Canada's views. Accordingly, we hold that the revenue rule bars Canada's action in its entirety and affirm the judgment of the district court.

### Discussion

### I. The Vitality of the Revenue Rule

The revenue rule is a longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns. It has been defended on several grounds, including respect for sovereignty, concern for judicial role and competence, and separation of powers. Examination of both the policies underlying the revenue rule, and the rule's congruence with the international tax policies pursued by the political branches of our government, supports the conclusion that the revenue rule is applicable to the particular facts of the case at hand.

Although the United States Supreme Court and this Circuit have not ruled on the precise scope of the rule, they have acknowledged its continuing vitality in the international context. *See Sun Oil Co. v. Wortman*, 486 U.S. 717, 740 n. 3, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988) (Brennan, J., concurring) (noting the rule's continued existence in the nation-to-nation setting); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 413–14, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (noting the view that many courts in the United States have adhered to the principle that "a court need not give effect to the penal or revenue laws of foreign countries"); *Oklahoma v. Gulf,*

*Colo. & Santa Fe Ry. Co.*, 220 U.S. 290, 299, 31 S.Ct. 437, 55 L.Ed. 469 (1911) ("The rule that the courts of no country execute the penal laws of another applies not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the state for the recovery of pecuniary penalties for any violation of statutes for the protection of its revenue or other municipal laws, and to all judgments for such penalties.") (quoting *Wisconsin v. Pelican Ins. Co. of New Orleans*, 127 U.S. 265, 290, 8 S.Ct. 1370, 32 L.Ed. 239 (1888), *overruled in part by Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 278, 56 S.Ct. 229, 80 L.Ed. 220 (1935)); *United States v. First Nat'l City Bank*, 321 F.2d 14, 23–24 (2d Cir.1963) ("It has long been a general rule that one sovereignty may not maintain an action in the courts of another state for the collection of a tax claim."), *rev'd on other grounds*, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *cf. United States v. Trapilo*, 130 F.3d 547, 551–53 (2d Cir. 1997) (appearing to recognize the endur-

ance of the revenue rule in the international context but finding it "inapplicable to the instant case"), *cert. denied*, 525 U.S. 812, 119 S.Ct. 45, 142 L.Ed.2d 35 (1998); *United States v. Pierce*, 224 F.3d 158, 167 (2d Cir.2000) (describing this aspect of *Trapilo* ).

The rule has its origin in eighteenth-century English court decisions seeking to protect British trade from the oppressiveness of foreign customs.[2] In *Boucher v. Lawson*, 95 Eng. Rep. 53 (K.B.1734) (Lord Hardwicke, C.J.), the court specifically acknowledged that its concerns with promoting British trade led it to uphold a transaction that violated Portuguese export laws. Chief Justice Lord Hardwicke stated that to do otherwise "would cut off all benefit of such trade from this kingdom, which would be of very bad consequence to the principal and most beneficial branches of our trade." *Id.* at 56.[3] Since then, the rule has entered United States common law, international law and the national law of other common law jurisdictions.[4] We note

---

**2.** *See, e.g.,* J.-G. Castel, *Canadian Conflict of Laws* 63 (1975) (noting that the revenue rule was first formulated "in an era of virulent commercial rivalry"); Richard E. Smith, *The Nonrecognition of Foreign Tax Judgments: International Tax Evasion*, 1981 U. Ill. L.Rev. 241, 246 ("Judicial reluctance to recognize a foreign tax claim or judgment originated in the decisions of the early eighteenth century English courts in an era of intense commercial competition."); *see also* Hans W. Baade, *The Operation of Foreign Public Law*, 30 Tex. Int'l L.J. 429, 438 (1995); Thomas B. Stoel, Jr., *The Enforcement of Foreign Non-criminal Penal & Revenue Judgments in England & the United States*, 16 Int'l & Comp. L.Q. 663, 671 (1967).

**3.** *See also Holman v. Johnson*, 98 Eng. Rep. 1120, 1121 (K.B.1775) (Lord Mansfield) ("For no country ever takes notice of the revenue laws of another."); *Planche v. Fletcher*, 99 Eng. Rep. 164, 165 (K.B.1779) (Lord Mansfield) ("One nation does not take notice of the revenue laws of another.").

**4.** *See, e.g., Aetna Ins. Co. v. Robertson*, 127 Miss. 440, 90 So. 120, 126 (1921) (Ethridge, J., dissenting) ("[I]t is a familiar principle of law that one state or country will not aid another state or country in giving effect to judgments enforcing its penal laws, or in collecting its revenues."); *Henry v. Sargeant*, 13 N.H. 321, 1843 WL 2069 (1843) (collecting cases that support the principle that penal and revenue laws are "strictly local" and are not enforced by foreign states); *State of Colorado v. Harbeck*, 232 N.Y. 71, 85, 133 N.E. 357 (1921) ("The rule [of "private international law"] is universally recognized that the revenue laws of one state have no force in another."); *Williams & Humbert Ltd. v. W & H Trade Marks (Jersey) Ltd.*, [1986] 1 All E.R. 129, 133–34 (H.L.) (Although the "revenue laws may in the future be modified by international convention or by the laws of the European Economic Community[,] ... at present the international rule with regard to the non-enforcement of revenue and penal laws is absolute."); *Peter Buchanan L.D. v. McVey*, [1955] A.C. 516, 524–28 (Ir.H.Ct.1950) (surveying application of the

that the international acceptance of the revenue rule extends to Canada's Supreme Court and provincial courts.[5]

## A. Respect for Sovereignty

Tax laws embody a sovereign's political will. They create property rights and affect each individual's relationship to his or her sovereign. They mirror the moral and social sensibilities of a society. Sales taxes, for example, may enforce political and moral judgments about certain products.

Import and export taxes may reflect a country's ideological leanings and the political goals of its commercial relationships with other nations.

In defense of the revenue rule, some courts have observed that the rule prevents foreign sovereigns from asserting their sovereignty within the borders of other nations, thereby helping nations maintain their mutual respect and security.[6] *See Sabbatino,* 376 U.S. at 448, 84

---

revenue rule by United Kingdom courts), *aff'd,* [1955] A.C. 530 (Ir.S.C.1951); *Government of India v. Taylor,* [1955] A.C. 491, 508 (H.L.) (denying claim of Indian government for unpaid taxes against company in liquidation in Britain because British courts would not enforce Indian revenue laws, stating "[w]e proceed upon the assumption that there is a rule of the common law that our courts will not regard the revenue laws of other countries: it is sometimes, not happily perhaps, called a rule of private international law: it is at least a rule which is enforced with the knowledge that in foreign countries the same rule is observed"); *see also* William S. Dodge, *Antitrust & the Draft Hague Judgments Convention,* 32 Law & Pol'y Int'l Bus. 363, 373 n. 43 (2001) (discussing the application of the revenue rule in both common law and civil law countries); Stoel, *supra* note 2, at 671–74 (discussing the application of the revenue rule in commonwealth countries).

5. A leading Canadian treatise on the conflict of laws noted:

As evidenced by a more recent decision of the Supreme Court of Canada [*United States v. Harden,* [1963] S.C.R. 366, 371 (Can.) ], this judicial doctrine [the revenue rule] is still vigorous in this country in spite of the modern spirit of international cooperation in the field of taxation. In the absence of specific treaty provisions, no matter how conscious and deliberate the tax evasion, there are no judicial or administrative remedies available to the defrauded state or province outside its territorial jurisdiction.

J.-G. Castel, *supra* note 2, at 63–64; *see United States v. Harden,* [1963] S.C.R. 366, 371 (Can.) (rejecting the enforcement of a stipulation of settlement of a tax case based on "the special principle that foreign States

cannot directly or indirectly enforce their tax claims [in our courts]") (quoting *Government of India v. Taylor,* [1955] A.C. 491, 515 (H.L.)); *Stringam v. Dubois,* [1993] 3 W.W.R. 273, 282–83 (Alta.Ct.App.) (barring claim of estate executor to compel sale of Canadian property because sale proceeds would be used to satisfy American estate taxes); Felix D. Strebel, *The Enforcement of Foreign Judgments & Foreign Public Law,* 21 Loy. L.A. Int'l & Comp. L.J. 55, 75 (1999) (reviewing Canadian cases which hold that "it is a well-established rule of public policy that Canadian law forbids a foreign state from suing, either directly or indirectly, in Canada for taxes alleged to be due to the state").

6. As Lord Denning explained in *Attorney General of New Zealand v. Ortiz,* [1984] A.C. 1 (H.L.):

[T]he class of laws which will be enforced are those laws which are an exercise by the sovereign government of its sovereign authority over property within its territory or over its subjects wherever they may be. But other laws will not be enforced. By international law every sovereign state has no sovereignty beyond its own frontiers. The courts of other countries will not allow it to go beyond the bounds. They will not enforce any of its laws which purport to exercise sovereignty beyond the limits of its authority.

*Id.* at 21; *see also Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson,* 597 F.2d 1161, 1165 (9th Cir. 1979) ("[I]f the court below was compelled to recognize the tax judgment from a foreign nation, it would have the effect of furthering the governmental interests of a foreign country, something which our courts customarily

S.Ct. 923 (White, J., dissenting on other grounds) ("Our courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign sovereign"); *see generally* F.A. Mann, *Prerogative Rights of Foreign States & the Conflict of Laws, in* Studies in International Law, 492–514 (1973).

Other courts have suggested that it is too sensitive and difficult for courts to determine whether such foreign revenue laws should be enforced by another sovereign. More than seventy years ago, a judge of this court, Learned Hand, offered a rationale in support of the revenue rule that still has resonance today:

> [A] court will not recognize those [liabilities] arising in a foreign state, if they run counter to the 'settled public policy' of its own. Thus a scrutiny of the liability is necessarily always in reserve, and the possibility that it will be found not to accord with the policy of the domestic state.... No court ought to undertake an inquiry which it cannot prosecute without determining whether those laws are consonant with its own notions of what is proper.

*Moore v. Mitchell,* 30 F.2d 600, 604 (2d Cir.1929) (L.Hand, J., concurring), *aff'd on other grounds,* 281 U.S. 18, 50 S.Ct. 175,

74 L.Ed. 673 (1930). In part, the reluctance of courts to delve into such matters is based on the "desire to avoid embarrassing another state by scrutinizing its penal and revenue laws." *Sabbatino,* 376 U.S. at 437, 84 S.Ct. 923; *see United States v. Boots,* 80 F.3d 580, 587 (1st Cir.), *cert. denied,* 519 U.S. 905, 117 S.Ct. 263, 136 L.Ed.2d 188 (1996). Similarly, in *Peter Buchanan L.D. v. McVey,* [1955] A.C. 516, 529 (Ir.H.Ct.1950), *aff'd,* [1955] A.C. 530 (Ir.S.C.1951), relied on by the United States Supreme Court in *Sabbatino,* 376 U.S. at 437–38, 84 S.Ct. 923, the Irish High Court noted that courts had traditionally exercised the right to reject foreign law that conflicted with the public policy or morality of the domestic court, and stated:

> [M]odern history [is not] without examples of revenue laws used for purposes which would not only affront the strongest feelings of neighbouring communities but would run counter to their political aims and vital interests.... So long as these possibilities exist it would be equally unwise for the courts to permit the enforcement of the revenue claims of foreign States or to attempt to discriminate between those claims which they would and those which they would not enforce. Safety lies only in universal rejection.

refuse to do."); *Banco Frances e Brasileiro S.A. v. Doe,* 36 N.Y.2d 592, 601–02, 370 N.Y.S.2d 534, 331 N.E.2d 502 (1975) (Wachtler, J., dissenting) ("Under the principle of territorial supremacy, fundamental to the community of nations, courts refuse to enforce any claim which in their view is a manifestation of a foreign State's sovereign authority."); *QRS 1 APS v. Frandsen,* [1999] 3 All E.R. 289, 294–97 (C.A.) (denying letters rogatory in connection with a tax claim under the revenue rule because "[i]t may be considered that this line of thinking is obsolete, but it still remains anchored within us that we will not permit the presence in our country of foreign tax men, even if represented by intermediaries; we do not tolerate that any help

may be given to them" (quoting Professor Mazeaud's commentary on the French court decision *Bemberg v. Fisc de la Provincia de Buenos Aires* (Feb. 24, 1949) (unreported) (internal quotation marks omitted)); *Taylor,* [1955] A.C. at 511 ("'[A] claim for taxes is but an extension of the sovereign power which imposed the taxes, and ... an assertion of sovereign authority by one State within the territory of another ... is (treaty or convention apart) contrary to all concepts of independent sovereignties.")); *see also In re Guyana Dev. Corp.,* 201 B.R. 462, 473–74 & n. 4 (Bankr.S.D.Tx.1996) (describing difficulty encountered by estate trustee in obtaining property overseas because foreign countries perceived trustee as IRS surrogate).

The case before us illustrates the point. Canada asserts that the revenue laws at issue were the product of an assessment of its public health priorities. In its complaint, Canada alleged:

To protect its youth from the health hazards of smoking, and to implement anti-tobacco programs and other public benefits, Canada doubled tobacco duties and taxes in February 1991. Tobacco duty and tax increases, and the resulting higher tobacco prices, held the promise of deterring young people from becoming addicted to a harmful drug. Tobacco duty and tax increases also held the promise of encouraging established smokers to quit.

The tenor of the times, at least among many people in the states of this judicial circuit, is anti-smoking. It is unlikely that enforcing a foreign tax regime aimed at deterring smoking would offend most citizens of New York, Connecticut or Vermont, whatever our personal habits or vices. (Of course, citizens of United States tobacco-growing states might vehemently object to Canada's taxation scheme.) But consider, for example, other possibilities involving a foreign sovereign's taxes. How would we respond if a foreign sovereign asked us to help enforce a tax designed to render it very expensive to sell United States newspapers in that nation? Or to make the inclusion of United States-made content in machinery built in that foreign country prohibitively expensive? Suppose it were a tax that had been raised to deter the sale of United States pharmaceuticals in that country? Or if a foreign nation imposed an immigration tax on members of a particular religious group or racial minority? It is much less likely that United States citizens would be kindly disposed towards tolerating such taxes, let alone providing judicial resources to enforce them. These hypotheticals—and we do not suggest that they are anything but

hypotheticals—demonstrate the sensitive nature of the issues that can be raised through a foreign sovereign's exercise of its taxation powers. *See* Stoel, *supra* note 2, at 678 ("[T]he tax judgments of one nation may be used to attain what other nations consider odious ends. . . ."). Addressing the public policy concerns raised by the imposition of such foreign taxes could embroil United States courts in delicate issues in which they have little expertise or capacity.

█ We do not suggest that the revenue rule always bars United States courts from furthering the tax policies of foreign sovereigns. This circuit has held the revenue rule "inapplicable" to a United States criminal action premised on violations of foreign tax laws. *United States v. Trapilo*, 130 F.3d 547, 551 (2d Cir.1997), *cert. denied*, 525 U.S. 812, 119 S.Ct. 45, 142 L.Ed.2d 35 (1998); *see also United States v. Pierce*, 224 F.3d 158 (2d Cir.2000). These concerns about sovereignty and extraterritorially are therefore not absolute, and are not implicated in every case involving foreign tax laws. However, as explained below in Section I.B, the particular facts of this case—most notably, the fact that a foreign sovereign plaintiff is directly seeking to enforce its tax laws, and that our government has negotiated and signed a treaty with this sovereign providing for limited extraterritorial tax enforcement assistance but stopping well short of the assistance requested here—lead us to be wary in this instance of becoming the enforcer of foreign tax policy.

## B. Judicial Role and Competence

### 1. General Principles

Concern about institutional role and competence provides particularly compelling support for the application of the revenue rule in this particular case. Our

Constitution provides the framework for interaction and dialogue among the branches of our government.[7] "The conduct of foreign relations is committed largely to the Executive Branch, with power in the Legislative Branch to, *inter alia*, ratify treaties with foreign sovereigns. The doctrine of separation of powers prohibits the federal courts from excursions into areas committed to the Executive Branch or the Legislative Branch." *In re Austrian and German Holocaust Litig.*, 250 F.3d 156, 163–64 (2d Cir.2001) (per curiam). The legitimacy of our courts depends in no small measure on exercising authority only in those areas entrusted to the courts. "The establishment of political or economic policies is not for the courts. Such action would be an abuse of judicial power." *National City Bank v. Republic of China*, 348 U.S. 356, 371, 75 S.Ct. 423, 99 L.Ed. 389 (1955) (Reed, J., dissenting).[8]

Extraterritorial tax enforcement directly implicates relations between our country and other sovereign nations. When a foreign nation appears as a plaintiff in our courts seeking enforcement of its revenue laws, the judiciary risks being drawn into issues and disputes of foreign relations policy that are assigned to—and better handled by—the political branches of government.[9] *See INS v. Aguirre–Aguirre*, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) ("The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of . . . diplomatic repercussions" caused by the exercise of sensitive political functions that implicate foreign relations.). Again, Judge Hand put it well:

> To pass [judgment] upon the provisions for the public order of another state is, or at any rate should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities. . . . Revenue laws fall within the same reasoning; they affect a state in matters as vital to its existence as its criminal laws.

*Moore*, 30 F.2d at 604 (L.Hand, J., concurring); *see also* Smith, *supra* note 2, at 257 ("[T]he possibility of a court engendering ill will and hindering the conduct of foreign relations by refusing to enforce a particular tax claim or judgment . . . is very real in the international context."); Stoel, *supra* note 2, at 678 ("[A]pplication of forum public policy to revenue laws may be offensive to the plaintiff State and have undesirable foreign relations consequences for the forum State."); *cf. Boots*, 80 F.3d at 587–88 (dismissing a criminal RICO action based on wire and mail fraud in connection with smuggling over the Canadian border on the ground that the action was barred by the revenue rule and the rule's foreign affairs rationale); Alan R. Johnson, *Systems for Tax Enforcement Treaties: The Choice Between Administrative Assessments & Court Judgments*, 10 Harv. Int'l L.J. 263, 264 (1969) (noting that many commentators dissatisfied with the revenue rule "view executive action by treaty as a preferable means of reform" because

---

7. *See generally A Question of Balance: The President, the Congress & Foreign Policy* (Thomas E. Mann ed., 1990); Louis Fisher, *Constitutional Dialogues: Interpretation as Political Process* (1988).

8. *See generally* Louis Henkin, *The Courts in Foreign Affairs, in Foreign Affairs & the United States Constitution* 131–48 (2d ed.1996).

9. The role of courts may vary depending on the nature of the foreign policy interest involved. *See* Harold Koh, *The National Security Constitution* 134–49 (1990). Our focus here is on the extraterritorial collection of taxes by a foreign sovereign, where we believe that the arguments for judicial reserve are quite strong.

of "the supposed foreign relations consequences").

## 2. The Leading Role of the Political Branches

Indeed, with regard to the domestic collection of foreign taxes and the enforcement of United States taxes abroad, the political branches of our government have consistently acted on behalf of the United States in establishing and managing the nation's relationships with other countries. As this Court stated in 1963:

> The nations of the world have only recently begun to deal with the problem of extra-territorial collection of tax revenues through the medium of negotiated tax treaties providing for mutual cooperation. Absent an explicit indication to the contrary, there should not be attributed to Congress an intent to give the courts of this nation, in this highly sensitive area of intergovernmental relations, the power to affect rights to property wherever located in the world. The apparent necessity of tax treaties underscores the conclusion that Congress has seen fit to handle this problem in another manner.

*United States v. First Nat'l City Bank,* 321 F.2d 14, 24 (2d Cir.1963) (citation omitted), *rev'd on other grounds,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *see Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson,* 597 F.2d 1161, 1165 (9th Cir.1979) (considering United States–Canadian tax treaties, and stating "[e]ven though the political branches of the two countries could have abolished the revenue rule between themselves at the time they entered into the treaties, they did not"). The concerns expressed in *First National City Bank* and *Gilbertson* remain relevant today.[10]

We believe that the political branches of our government have clearly expressed their intention to define and limit the parameters of any assistance given with regard to the extraterritorial enforcement of a foreign sovereign's tax laws. Thus, that version of the revenue rule under which United States courts abstain from assisting foreign sovereign plaintiffs with extraterritorial tax enforcement is fully consistent with our broader legal, political and institutional framework.

The parties have pointed us to, and we have been able to confirm the existence of, only five countries with which the United States has entered into income tax treaties under which the contracting parties have agreed to provide general assistance in collecting tax judgments.[11] The treaties

**10.** *See generally* Dennis D. Curtin, *Exchange of Information Under the United States Income Tax Treaties,* 12 Brook. J. Int'l L. 35, 35 (1986) ("There is a generally recognized international principle that one sovereign will not aid another in the enforcement of its revenue laws.... To circumvent the application of this principle, many countries have entered into bilateral income tax treaties."); Stoel, *supra* note 2, at 679 (arguing that foreign relations concerns suggest that it is "preferable that enforcement of foreign-country tax judgments be accomplished by treaty rather than by judicial initiative").

**11.** The most recent versions of these treaty provisions are the following: Revised Protocol Amending the Convention With Respect to Taxes on Income and on Capital of September 26, 1980, Mar. 17, 1995, U.S.-Canada, art. 15, S. Treaty Doc. No. 104–4 (entered into force Nov. 9, 1995) [hereinafter Canada–U.S. 1995 Protocol]; Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Aug. 19, 1999, U.S.-Denmark, art. 27, S. Treaty Doc. No. 106–12 (entered into force Mar. 31, 2000); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital, Aug. 31, 1994, U.S.-France, art. 28, S. Treaty Doc. No. 103–32 (entered into force Dec. 30, 1995); Convention for the Avoidance of Double Taxation and

with four of these countries—Denmark, France, Sweden and the Netherlands—providing extraterritorial tax collection assistance were first signed and ratified in the late 1930s and 1940s.[12] Relatively soon thereafter, the United States Senate sought to limit the extent to which United States courts and agencies would be obligated to render foreign tax collection assistance. In the words of a member of the Senate Foreign Relations Committee, in 1947 attention was focused on the mutual collection assistance provisions of the treaty with France, and the Committee

> discovered that there had been developed ... a number of objections as to the way by which, under the convention, our country undertook to collect taxes for the government of France. This matter was of such concern that we held a number of hearings [and recommended consultation between individuals, businesses and interest groups concerned about the treaty and State Department representatives]. We discovered that there had been embodied in the convention certain methods of collection of taxes which we as a subcommittee felt were not desirable, and at our request the whole matter was reviewed again by the State Department representatives.

Staff of the Joint Comm. on Internal Revenue Taxation, 1 *Legislative History of United States Tax Conventions* 1152 (1962) [hereinafter "Legislative History Vol. 1"] (floor statement of Sen. Smith on June 2, 1948). A compromise was embodied in a 1948 Supplementary Protocol, ratified by the full Senate, which provided that collection assistance under the original treaty with France would not be given with respect to taxpayers of the requested state. *See* Supplementary Protocol to the Convention About Double Taxation and Fiscal Assistance, May 17, 1948, U.S.-France, art. I, T.I.A.S. No.1982 (entered into force Oct. 17, 1949), *available at Legislative History Vol. 1*, at 1191.

Next, "in 1951, the Senate considered income tax treaties for Greece, Norway, and South Africa which, as originally submitted to the Senate, would have obligated the treaty countries to provide broad tax collection assistance to each other." Staff of the Joint Comm. on Taxation, 104th Cong., *Explanation of Proposed Protocol to the Income Tax Treaty Between the United States & Canada* 43 n. 52 (Joint Comm. Print 1995) [hereinafter "Taxation Comm. Staff Explanation of Canada U.S. Protocol"]. Specifically, the treaties provided that "finally determined" revenue claims would be accepted for enforcement by the other contracting state and collect-

the Prevention of Fiscal Evasion With Respect to Taxes on Income, Dec. 18, 1992, U.S.-Netherlands, art. 31, S. Treaty Doc. No. 103–6 (entered into force Dec. 31, 1993); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Sept. 1, 1994, U.S.-Sweden, art. 27, S. Treaty Doc. No. 103–29 (entered into force Oct. 26, 1995). Apparently, mutual collection assistance provisions are more common in United States estate tax conventions, where different issues are at stake. *See* U.S. Treasury Dep't Technical Explanation, Canada–U.S.1995 Protocol (released June 13, 1995) (discussing art. 15 of

the Canada–U.S.1995 Protocol), *available at* 95 Tax Notes Int'l 115–38.

**12.** *See* Staff of the Joint Comm. on Internal Revenue Taxation, 1 *Legislative History of United States Tax Conventions* 707, 719 (1962) (U.S.-Denmark convention); *id.* at 905, 922–23, (U.S.-France conventions); Staff of the Joint Comm. on Internal Revenue Taxation, 2 *Legislative History of United States Tax Conventions* 1890, 1932 (1962) (U.S.-Netherlands convention); *id.* at 2355, 2369–70 (U.S.-Sweden convention). The fifth such treaty, recently negotiated with Canada, is discussed *infra,* Section I.B.3.

ed as though they were domestic tax claims, but that such assistance would not be accorded with regard to citizens, corporations or other entities of the state to which application for collection assistance was made.[13]

The limitation of collection assistance in these treaties in accordance with the Senate policy of the 1948 U.S.-France protocol was apparently not sufficient. A report was issued by the Senate Foreign Relations Committee concluding that:

> [T]he committee believes that the collection provisions of the South African, Greek, and Norwegian income-tax conventions are too broad, and it repeats that, as a general rule, it is not believed wise to have one government collect the taxes which are due to another government. . . . Thus, the committee recommends the acceptance of the collection provisions . . . subject to the understanding that each of the governments may collect the other's tax solely in order to insure that the exemptions or reduced rates of tax provided under the respective conventions will not be enjoyed by persons not entitled to such benefits.

S. Ex. Rep. No. 1, at 21 (1951), *available at Legislative History Vol. 1*, at 605. A senator who was very involved in the ratification process explained further:

> It is the opinion of the subcommittee and of the whole committee that the [mutual collection assistance provisions are] too broad. As a general rule it is not believed wise to have one government collect the taxes which are due to another government. Therefore the committee recommends that these provisions be eliminated from the pending conventions. . . . [T]his was the view taken by the committee with respect to all these assistance provisions. It was simply deemed unwise . . . to obligate our country to undertake the collection in our own courts of taxes due to the foreign countries dealt with in these conventions. It will be recalled that in many instances, or perhaps all, the courts would be called upon to enforce very harsh civil penalties, and it was not deemed wise for our courts to undertake that particular job.

*Legislative History Vol. 1*, at 1377 (floor statement of Sen. George on Sept. 17, 1951).

In accordance with these views, "[t]he Senate gave its advice and consent to those treaties subject to an understanding that the countries would only provide such collection assistance as would be necessary to ensure that the exemption or reduced rate of tax granted by the treaties would not be enjoyed by persons not entitled to those benefits." *Taxation Comm. Staff Explanation of Canada U.S. Protocol*, at 43 n. 52 (discussing Sept. 17, 1951 Senate vote); *see generally* Smith, *supra* note 2, at 261–62. This Senate policy was also implemented through an analogous narrowing of the collection assistance provision when the Netherlands tax convention,

---

13. *See* Convention for Avoidance of Double Taxation and Prevention of Fiscal Evasion With Respect to Taxes On Income, Feb. 20, 1950, U.S.-Greece, art. XIX, T.I.A.S. No. 2902 (entered into force Dec. 30, 1953), *available at Legislative History Vol. 1*, at 1419–21; Convention on Double Taxation, June 13, 1949, U.S.-Norway, art. XVII, T.I.A.S. No. 2357 (entered into force Dec. 11, 1951), *available at Legislative History Vol. 2*, at 2114; Convention For the Avoidance of Double Taxation and For Establishing Rules of Reciprocal Administrative Assistance With Respect to Taxes On Income, Dec. 13, 1946, U.S.-South Africa, art. XV, T.I.A.S. No. 2510 (entered into force July 15, 1952), *available at Legislative History Vol. 2*, at 2511; Supplementary Protocol, July 14, 1950, U.S.-South Africa, art. VII, T.I.A.S. No. 2510, *available at Legislative History Vol. 2*, at 2529.

whose broad collection assistance provisions had been negotiated before the September 17, 1951 Senate vote, *see Legislative History Vol. 2*, at 1667, was extended to cover the Netherlands Antilles. *See id.* at 1678, 1680–82.

In transmitting future tax conventions to the Senate, the State Department often noted that the mutual collection assistance provisions were narrowed to bring them into harmony with the Senate's expressed policy. *See, e.g.,* Letter from Secretary of State John Foster Dulles to the President of Apr. 18, 1955 (concerning U.S.-Italy convention), *available at Legislative History Vol. 2*, at 1659; Letter from Under Secretary of State Walter B. Smith to the President of June 1, 1953 (concerning U.S.-Australia convention), *available at Legislative History Vol. 1*, at 74–75; Letter from Secretary of State Dean Acheson to the President of Jan. 6, 1953 (concerning U.S.-Belgium convention), *available at Legislative History Vol. 1*, at 258.

This general policy on extraterritorial collection assistance still prevails. For example, the United States Department of Treasury has released the United States Model Income Tax Convention of September 20, 1996 ("1996 Model Convention"). The 1996 Model Convention contains no general provision assisting or allowing the enforcement of foreign tax judgments or claims. Instead, Article 26 of the Convention ("Exchange of Information and Administrative Assistance") provides that "a Contracting State will endeavor to collect on behalf of the other State only those amounts necessary to ensure that any exemption or reduced rate of tax at source granted under the Convention by that other State is not enjoyed by persons not entitled to those benefits." 1996 Model Convention Technical Explanation (2001) (explaining Article 26 ¶ 4).[14]

Our government's continuing policy preference against enforcing foreign tax laws is further revealed by the fact that in negotiating and ratifying the OECD[15] Convention on Mutual Administrative Assistance in Tax Matters, Treaty Doc. 101–6, the executive branch recommended and the Senate adopted a reservation to the treaty's reciprocal collection assistance provisions. *See* Brian J. Arnold, *New Protocol to Canada–U.S. Tax Treaty Addresses Estate Tax Issues, Limitations on Benefits, & Mutual Assistance*, 9 Tax Notes Int'l 859, 862 (1994) ("Although the United States has ratified the OECD Convention . . . it reserved its position with respect to the provisions dealing with collections."); 136 Cong. Rec. S13295 (Sept. 18, 1990) (detailing the vote on the reservation); *see also* 136 Cong. Rec. S13294 (statement of

---

14. The limited assistance offered in Article 26 of the Model Convention is specifically qualified: "[Paragraph 4] shall not impose upon either of the Contracting States the obligation to carry out administrative measures that would be contrary to its sovereignty, security, or public policy." 1996 Model Convention, Art. 26 ¶ 4.

15. The Organization for Economic Cooperation and Development ("OECD") was established in Paris in December 1960. *See United States v. A.L. Burbank & Co.*, 525 F.2d 9, 15 (2d Cir.1975). The OECD is an organization which provides its 30 member states "a setting in which to discuss, develop and perfect economic and social policy." OECD Online, What is OECD?, *available at* http://www.oecd.org/about/general/index.htm (last modified Aug. 2, 2001). The United States, Canada, and many of the world's developed, democratic, market-oriented states are members. *See id.* In the realm of international taxation, the OECD's model convention "has almost acquired the status of a multilateral instrument" because of the reliance placed on it by many countries in negotiating bilateral tax conventions. American Law Institute, *International Aspects of United States Income Taxation II: United States Income Tax Treaties* 3 (1992).

Sen. Pell) (Sept. 18, 1990) ("The administration stated, and the Committee on Foreign Relations concurred, that it did not believe it appropriate, at this time, to participate in other aspects of the convention, that is cooperation in tax collection efforts . . . ."); *see generally Taxation Comm. Staff Explanation of Canada–U.S. Protocol,* at 42–43 (discussing the reservation).

Consistent with this continuing policy, the United States has over the years entered into a number of tax treaties with foreign sovereigns that provide for information exchange and, sometimes, limited collection assistance, but notably fail to make any provision for general enforcement of foreign tax judgments or claims.[16] It seems to us that the usual absence in our negotiated tax conventions of any provision for the extraterritorial enforcement of a sovereign's tax judgments or claims cannot be not accidental, but instead must reflect the considered policy of the political branches of our government. Thus, the political branches of our government have clearly expressed their intention to define and strictly limit the parameters of any assistance given with regard to the extraterritorial enforcement of a foreign sovereign's tax laws. In this area of foreign

relations policy where the political branches have primacy, courts must be wary of intruding in a way that undermines carefully conceived and negotiated policy choices. Accordingly, as a general matter, that version of the revenue rule under which United States courts abstain from assisting foreign sovereign plaintiffs with extraterritorial tax enforcement is fully consistent with our broader legal, diplomatic, and institutional framework.

### 3. The United States–Canada Treaty Framework

Significantly, we have fairly recently negotiated a tax convention with Canada providing for assistance with the enforcement of certain fully adjudicated foreign tax judgments. *See* Canada–U.S.1995 Protocol, *supra* note 11, art. 15. Prior to 1995, the U.S.-Canada tax convention was similar with respect to collection assistance to the United States Model Convention and the bilateral income tax treaties negotiated subsequent to the 1951 Senate action. *See Taxation Comm. Staff Explanation of Canada–U.S. Protocol,* at 41 n. 49. The Canada–U.S. treaty prior to 1995 provided for exchange of information between the

---

**16.** *See, e.g.,* Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Jan. 25, 1998, U.S.-Estonia, art. 26, S. Treaty Doc. No. 105–55 (entered into force Dec. 30, 1999); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital Gains, July 28, 1997, U.S.-Ireland, art. 27, S. Treaty Doc. No. 105–31 (entered into force Dec. 17, 1997); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital, June 17, 1992, U.S.-Russian Fed., art. 25, S. Treaty Doc. No. 102–39 (entered into force Dec. 16, 1993); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, July 11, 1988, U.S.-Indonesia, arts. 26, 29, T.I.A.S.

No. 11593 (entered into force Dec. 30, 1990); Agreement for the Exchange of Information With Respect to Taxes, Sept. 27, 1990, U.S.-Honduras, art. 4, T.I.A.S. No. 11745 (entered into force Oct. 11, 1991); Agreement for the Exchange of Information With Respect to Taxes, Feb. 15, 1990, U.S.-Peru, art. 4, T.I.A.S. No. 12060 (entered into force Mar. 31, 1993); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Sept. 18, 1992, U.S.-Mexico, art. 27, S. Treaty Doc. No. 103–07 (entered into force Dec. 28, 1993); Agreement for the Exchange of Information With Respect to Taxes, Nov. 9, 1989, U.S.-Mexico, art. 4, T.I.A.S. No. 12404 (entered into force Jan. 18, 1990). We note that these tax treaties concern primarily income and capital taxes, rather than customs duties.

tax authorities of the contracting states, and also for minimal mutual collection assistance—limited to that assistance necessary to ensure that the exemptions, reduced rates or other benefits provided in the treaty would not be enjoyed by persons not entitled to those benefits. *See* Convention With Respect to Taxes on Income and on Capital, Mar. 28, 1984, U.S.-Canada, arts. XXVI & XXVII, T.I.A.S. No. 11087 (entered into force Aug. 16, 1984); *see also Taxation Comm. Staff Explanation of Canada–U.S. Protocol,* at 41–42.

There are several notable features of the 1995 amendments. First, the expanded mutual collection assistance provision "appl[ies] to all categories of taxes collected by or on behalf of the Government of a Contracting State." Canada–U.S.1995 Protocol, *supra* note 11, art. 15 (adding Article XXVI A, ¶ 9 to the treaty); *see Taxation Comm. Staff Explanation of Canada–U.S. Protocol,* at 41 ("The proposed protocol provides that the countries are to undertake to lend assistance to each other in collecting all categories of taxes collected by or on behalf of the government of each country."). Thus, this treaty provision is intended by both governments to set the parameters for mutual collection assistance with regard to every kind of tax, including the taxes at issue in this case.[17]

Second, the 1995 amendments bar assistance with the collection of any revenue claim arising during the time an individual or corporation was a citizen of or incorporated in, respectively, the "requested State." Canada–U.S.1995 Protocol, *supra* note 11, art. 15, ¶ 8. Thus, paragraph 8 bars Canada from asking the United States for collection assistance with regard to a Canadian revenue claim arising when a person was a United States citizen or corporation,[18] which includes many of the defendants and revenue claims in this case.

Third, the 1995 protocol provides that a finally determined revenue claim "*may* be accepted for collection" by the other sovereign. *Id.,* ¶ 3 (emphasis added). "Paragraph 3 . . . clarifies that the Contracting State from which assistance was requested . . . has discretion as to whether to accept a particular application for collection assistance." U.S. Treasury Dep't Technical Explanation, Canada–U.S.1995 Protocol (released June 13, 1995) (discussing art. 15 of the 1995 protocol), *available at* 95 Tax Notes Int'l 115–38 [hereinafter "Treasury Technical Explanation"]. Thus, our government has deemed it advisable to allow the executive branch to consider and determine, in each instance, whether a particular Canadian tax liability should be enforced by the United States.

Fourth, the 1995 protocol requires that a state seeking collection assistance certify that the revenue claim has been "finally determined." Canada–U.S.1995 Protocol, *supra* note 11, art. 15, ¶ 2. A claim has been "finally determined" when "the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted." *Id.* Accordingly, the treaty does not abrogate the rule that courts of one nation should not adjudicate the unresolved tax claims of another. That is particularly significant, because in this case Canada is not asking for the enforcement of a fully

---

17. *See* Joseph B. McFarland, *The U.S.-Canada Income Tax Treaty: The Revised Protocol,* 69 Fla. B.J. 62, 64 (July–Aug.1995) (noting that the mutual collection assistance provision covers all taxes including customs and excise taxes).

18. *See* Arnold, *supra,* 9 Tax Notes Int'l at 863 (discussing this provision).

adjudicated Canadian tax judgment, but rather for a United States court to assess and adjudicate the application of Canadian tax laws to the wrongdoing alleged in its complaint.[19]

We do not believe that the United States–Canada treaty (allowing collection of certain fully-adjudicated tax judgments) should be broadly construed to suggest a change in attitude toward the involvement of United States courts in adjudicating foreign tax claims that have not been first reduced to judgment. In fact, allowing assistance with collecting fully-adjudicated judgments was "a departure from U.S. treaty policy of recent years." *Taxation Comm. Staff Explanation of Canada–U.S. Protocol*, at 7. It seems clear that the extent of such policy change is a sensitive question implicating diverse considerations better handled by the political branches. *See id.* at 43 (noting that in future treaties "consideration may need to be given as to whether it is appropriate for the United States to assist in the collection of another government's taxes. This analysis may involve an evaluation of both the substantive and procedural elements of the other government's taxes, as well as an analysis of broader policy issues, such as the relative compatibility of the other government's legal systems and individual protections with those of the United States."). Before entering the 1995 Canada–U.S. Protocol, our government carefully considered whether and to what extent extraterritorial tax enforcement was advisable:

> [T]he ultimate decision of the U.S. and Canadian negotiators to add the collection assistance article was attributable to the confluence of several unusual factors. Of critical importance was the

similarity between the laws of the United States and Canada. The Internal Revenue Service, the Justice Department, and other U.S. negotiators were reassured by the close similarity of the legal and procedural protections afforded by the Contracting States to their citizens and residents and by the fact that these protections apply to the tax collection procedures used by each State. In addition, the U.S. negotiators were confident, given their extensive experience in working with their Canadian counterparts, that the agreed procedures could be administered appropriately, effectively, and efficiently. Finally, given the close cooperation already developed between the United States and Canada in the exchange of tax information, the U.S. and Canadian negotiators concluded that the potential benefits to both countries of obtaining such assistance would be immediate and substantial and would far outweigh any cost involved.

*Treasury Technical Explanation* (discussing art. 15). In this area, it is not the courts' role to press ahead further and faster than the political branches have deemed it wise to travel after careful deliberation.

A final aspect of the 1995 protocol we find noteworthy is the provision that the contracting states shall agree "to ensure comparable levels of assistance to each" other with regard to extraterritorial tax collection. Canada–U.S.1995 Protocol, *supra* note 11, art. 15 (adding Article XXVI A, ¶ 11 to the treaty). In other words, both governments have expressed a policy preference for reciprocity in the level of enforcement of each other's tax judgments

---

**19.** Because the United States has negotiated for certain reciprocal assistance with respect to unadjudicated tax claims with at least one other nation, *see* Tax Convention With France, *supra* note 11, art. 28 ¶ 4, the lack of any United States Canada tax treaty with such a provision is telling.

and claims.[20] *See generally* Arnold, *supra,* 9 Tax Notes Int'l at 863 (discussing the reciprocity required by the U.S.-Canada treaty). In light of this, the fact that Canada's courts have repeatedly reaffirmed the vitality of the revenue rule, *see supra* note 5, becomes significant. Declining to apply the revenue rule in this case would arguably undermine the considered policy judgment of our political branches.[21] Moreover, it would potentially allow Canada to obtain assistance it has not negotiated for [22] and that would be greater than the assistance our government would likely receive as a litigant in Canada's courts.

In sum, the provisions of the 1995 protocol indicate that the political branches of the two countries intended that the type of taxes involved in this case would be covered by the treaty's collection assistance provisions, yet negotiated for limitations on collection assistance that specifically exclude the type of assistance Canada seeks in this case. By permitting such a claim to go forward, we would be ignoring and undermining the treaty negotiation process and the clearly expressed views of the political branches of the United States government and instead engaging in *ad hoc* judicial policymaking in the delicate realm of foreign affairs.[23]

### 4. The Significance of the Identity of the Plaintiff

In *United States v. Boots,* 80 F.3d 580 (1st Cir.), *cert. denied,* 519 U.S. 905, 117 S.Ct. 263, 136 L.Ed.2d 188 (1996), one of the few recent cases dealing with the revenue rule in a similar context, the First Circuit relied in part on similar reasoning to dismiss an indictment for a cross-border smuggling scheme designed to avoid Cana-

---

**20.** United States anti-smuggling laws also require reciprocity before allowing American courts to take notice of foreign revenue laws. *See* 18 U.S.C. § 546; 19 U.S.C. §§ 1701–1711. For example, outbound smuggling is banned only to the extent the receiving sovereign has banned similar smuggling into the United States. *See* 18 U.S.C. § 546; *Boots,* 80 F.3d at 588.

**21.** *Cf. Estados Unidos Mexicanos v. DeCoster,* 229 F.3d 332, 340 (1st Cir.2000) ("Care should be taken not to impinge on the Executive's treaty-making prerogatives.... The Executive often requires, before extending rights to foreign nations, that there be agreements providing for reciprocal protection of American interests. The ability of the other branches to secure such reciprocity could be undermined if the Judiciary did not adhere to the principal of non-interference.").

**22.** We recognize the give-and-take of policy priorities involved in the negotiating of tax treaties and are therefore reluctant to upset the balance negotiated between our two governments. *See generally* Testimony of Leslie B. Samuels, Ass't Sec'y for Tax Policy, U.S. Treasury Dep't, before the Senate Comm. on Foreign Relations, June 13, 1995, *available through* Federal News Service (noting that "[o]btaining the agreement of our [tax] treaty

partners ... sometimes requires concessions on our part. Similarly, other countries sometimes must make concessions to obtain our agreement on issues that are critical to them. The give and take that is inherent in the negotiating process leading to a treaty is not unlike the process that results in legislation in [the Senate]."); Tsilly Dagan, *The Tax Treaties Myth,* 32 N.Y.U.J. Int'l L. & Pol. 939, 949 (2000) (describing the "strategic policy choices" involved in the creation of international tax regimes); John F. Avery Jones, *Are Tax Treaties Necessary?,* 53 Tax L.Rev. 1, 3 (1999) (describing how countries use domestic legislative changes to "preserve [their] negotiating position" in international tax treaties).

**23.** Courts must be cognizant of the limited role they play in formulating policy and the fact that "[i]t is crucial to the efficient execution of the Nation's foreign policy that the Federal Government ... speak with one voice when regulating commercial relations with foreign governments." *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 99, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (quoting *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 285, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976)).

dian taxes. *See id.* at 587 ("[F]or our courts effectively to pass on [foreign revenue] laws raises issues of foreign relations which are assigned to and better handled by the legislative and executive branches of government."), and *id.* at 587–88 ("Of particular concern is the principle of noninterference by the federal courts in the legislative and executive branches' exercise of their foreign policymaking powers."). This Circuit has disagreed with *Boots* to the extent it applied the revenue rule in a criminal action, *see United States v. Trapilo*, 130 F.3d 547, 549 (2d Cir.1997), *cert. denied*, 525 U.S. 812, 119 S.Ct. 45, 142 L.Ed.2d 35 (1998); *United States v. Pierce*, 224 F.3d 158 (2d Cir.2000), but we find the *Boots* reasoning persuasive with respect to the present civil suit. This approach is consistent with our precedent because, with regard to the revenue rule,

there is a critical difference between this civil suit brought by a foreign sovereign and the criminal actions previously considered by panels of this court.[24] In *Trapilo* and *Pierce* (and in *Boots*), the executive branch of the United States brought the case, while here, Canada is the plaintiff. When the United States prosecutes a criminal action, the United States Attorney acts in the interest of the United States, and his or her conduct is subject to the oversight of the executive branch. Thus, the foreign relations interests of the United States may be accommodated throughout the litigation.[25] In contrast, a civil RICO case brought to recover tax revenues by a foreign sovereign to further its own interests, may be, but is not necessarily, consistent with the policies and interests of the United States.[26]

**24.** Our dissenting colleague characterizes the distinction we make as one between criminal and civil RICO. We, however, distinguish between (criminal) actions prosecuted by the United States, on the one hand, and (civil) actions prosecuted by a foreign sovereign, on the other.

**25.** In some cases in which foreign relations matters within the executive's control were involved, courts have allowed litigation to proceed when the executive branch expressed its consent to adjudication by the courts. *See First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 768–70, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (holding that where "the branch of the government responsible for the conduct of ... foreign relations" has advised the court that adjudication of a case will not "frustrate the conduct of this country's foreign relations," the act-of-state doctrine need not be applied because "[i]t would be wholly illogical to insist that such a rule, fashioned because of fear that adjudication would interfere with the conduct of foreign relations, be applied in the face of an assurance from that branch of the Federal Government that conducts foreign relations that such a result would not obtain"); *National Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 860 F.2d 551, 555–56 (2d Cir.1988), *cert. denied*, 489 U.S.

1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989) (despite lack of formal diplomatic recognition of a foreign sovereign, wholly owned corporation of that foreign government could bring suit in federal courts in light of executive branch's willingness to allow that nation to litigate its contract and tort claims within United States forum). There has been no such expression of consent or approval in the case at bar.

**26.** In its brief in opposition to defendant's petition for certiorari in *Pierce v. United States*, the Solicitor General, on behalf of the United States, distinguished between Canada and the United States bringing a case in the United States against cross-border tobacco smuggling:

This case does not implicate either the revenue rule itself or the rationale on which it is based. It is not an action brought by the government of Canada to enforce a Canadian tax judgment. It is, instead, an action brought by the United States government to enforce its own criminal laws against money laundering and wire fraud committed in this country.

Brief for Respondent at 8, *Pierce v. United States*, Nos. 97–1792, 97–8964 (U.S.1997). The United States also stated: "It is thus evident that domestic criminal prosecutions

*Trapilo* and *Pierce* are not controlling here. The court in *Trapilo* considered whether the prosecution of a money laundering scheme was barred by the revenue rule, and held that it was not because "[a]t the heart of this indictment is the misuse of the wires in furtherance of a scheme to defraud the Canadian government of tax revenue, not the validity of a foreign sovereign's revenue laws." *Trapilo*, 130 F.3d at 552. In *Pierce*, the court reversed the convictions of two of the *Trapilo* defendants on the ground that the government had failed to establish that the defendants could have deprived anyone of an interest in property when it failed to offer proof of the existence and applicability of Canada's tax laws that the defendants had intended to circumvent.[27] *See Pierce*, 224 F.3d at 167–68. Taken together, these two cases stand for the proposition that a scheme to defraud a foreign nation of its right to impose taxes may be punished under appropriate circumstances by the United States government, in United States courts, using United States penal laws; they do not hold that United States courts, in a civil case, may determine the validity of a foreign tax law or the extent of liability thereunder and award that amount to a foreign sovereign. As we have outlined, the political branches have repeatedly expressed their intention to handle the issue of extraterritorial tax enforcement by a foreign sovereign through the treaty process. This case, unlike *Trapilo* and *Pierce*, involves a request for extraterritorial tax enforcement by a foreign sovereign. The treaty between Canada and the United States confirms that Canada has other, more appropriate, avenues by which to pursue its unadjudicated tax claims—specifically by negotiating for greater assistance with the political branches acting on behalf of the United States.

## C. Criticisms of the Revenue Rule

Before considering the interaction between the revenue rule and RICO in this case, we pause to acknowledge the criticism to which the revenue rule has been subject and to consider additional arguments against the rule advanced by Canada in this case.

In academic literature, there is a long history of criticism of the revenue rule as creating improper incentives for moral and commercial conduct. *See, e.g.*, Joseph Story, *Commentaries on the Conflict of Laws* 338–39 (Melville M. Bigelow ed., 8th ed. 1883) (the revenue rule is "inconsistent with good faith and moral duties of nations"); 3 J. Kent, *Commentaries on American Law* 265 (O.W. Holmes, Jr., ed., 12th ed., John M. Gould ed., 14th ed., 1896) (criticizing the broad application of the revenue rule as "laying down an exceedingly lax morality"); *see generally* ALI, *United States Income Tax Treaties, supra*

such as this one do not present the concerns that, as explained by Judge Hand in *Moore v. Mitchell*, motivated the adoption of the revenue rule in the different context of civil suits by foreign governments to enforce their own tax judgments." *Id.* at 11.

27. In *Pierce*, the defendants were "not accused of scheming to defraud the Canadian government of its property, but of its *right* to obtain property, its *right* to be paid money." *Pierce*, 224 F.3d at 165. The court assumed that such a right could constitute "property" for the purpose of RICO. *See id.* at 165–66;

*see also Illinois Dep't of Revenue v. Phillips,* 771 F.2d 312, 317 (7th Cir.1985) (reluctantly allowing a state to pursue a RICO claim based on tax fraud). These decisions predate *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 368, 148 L.Ed.2d 221 (2000), in which the Supreme Court held that an unissued video poker license held by the state did not constitute "property" for the purposes of the mail fraud statute. Given that we decide this case based on the revenue rule, it is unnecessary for us to visit the issue of what constitutes "property" under RICO in light of *Cleveland.*

note 15, at 122–25 (criticizing the revenue rule and recommending that United States tax treaties allow the enforcement of foreign tax judgments in United States courts). The most recent Restatement of the Law of Foreign Relations states that "[i]n an age when ... instantaneous transfer of assets can be easily arranged, the rationale for not recognizing or enforcing tax judgments is largely obsolete." Restatement (Third) of the Law of Foreign Relations § 483, Reporter's Note 2 (1987) (cited in *Trapilo,* 130 F.3d at 550 n. 4, and *Pierce,* 224 F.3d at 163 n. 3). The analytical underpinnings of the rule have been criticized. *See, e.g.,* Stoel, *supra* note 2, at 668–69 (noting that "it is not clear why difficulties in proving or interpreting foreign law would be any greater [with revenue laws] than in other civil suits involving foreign law" and "[i]n any case, the principle of *forum non conveniens,* normally used to take account of these difficulties ... would remain applicable"). Various other criticisms of the revenue rule have been advanced. For example, it has been noted that the early British cases contain scanty reasoning justifying the rule's emergence. Nor did the revenue rule provide the basis of decision in those early British cases. The analogy of revenue enactments to penal laws has been criticized as inconsistent with the modern recognition that the obligation to pay taxes is not penal.[28] While conceding the force of many of these points, we nevertheless decide that, in the specific context of this case—in particular, where the two sovereigns concerned have recognized the vitality of the revenue rule and have a well-established treaty process that has strictly limited the extent to which each government can pursue its tax claims using the other's domestic administrative and judicial processes—

the foreign affairs and separation of powers rationales for the revenue have substantial continuing force.

■ Canada also argues that the revenue rule conflicts with the act-of-state doctrine and therefore should not be applied. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 450 n. 11, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (White, J., dissenting on other grounds) (observing the seeming inconsistency between the act-of-state doctrine and the revenue rule approach to the validity of foreign laws). Under the act-of-state doctrine, a court presumes the validity of a foreign state's laws within that state's territory. *See Galu v. Swissair,* 873 F.2d 650, 653 (2d Cir.1989). In contrast, the revenue rule presumes the extraterritorial unenforceability of a foreign sovereign's tax laws. Defendants contend that the rules are consistent and "represent two different ways in which courts steer clear of foreign affairs in different contexts."

Despite the seeming inconsistency, we believe that defendants have the better argument. In *Sabbatino,* the Supreme Court explained the "constitutional underpinnings" of the act-of-state doctrine:

> It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for

---

**28.** For a thoughtful discussion of these points, see *European Community v. RJR Nabisco,* *Inc.,* 150 F.Supp.2d 456 (E.D.N.Y.2001).

itself and for the community of nations as a whole in the international sphere. *Sabbatino*, 376 U.S. at 423, 84 S.Ct. 923. The revenue rule appears to share these underpinnings. Under the act-of-state doctrine, the assessment of the validity of a foreign law is limited to its application within the sovereign's territory; under the revenue rule, United States courts avoid the application of a foreign sovereign's tax laws in the United States. Both approaches enable courts to avoid entanglement with questions about the underlying validity of a foreign sovereign's laws.

In sum, as this case demonstrates, sound policy considerations, including international comity, the proper exercise of sovereign powers, institutional competence and separation of powers, and recognition of the U.S.-Canada tax treaty relationship, support the continuing viability and application of the revenue rule to this case.

## II. RICO and the Revenue Rule

■ Canada argues that the revenue rule is not relevant here because it brings this action under a United States statute—civil RICO—rather than under Canadian tax law. Canada challenges the district court's decision dismissing its complaint, stating that

> [the dismissal] violates the fundamental principle that a court must carefully examine a statute's structure, purpose, and

policies before applying common law rules to restrict or modify a congressionally created private remedy.... At the time Congress enacted RICO, no court had applied the common law revenue rule to bar a claim of a foreign sovereign to enforce a United States statute.... Congress could not have foreseen that a court later would limit RICO by extending the common law revenue rule.

Because we find that the revenue rule is a doctrine with continuing force in the particular context of this case, Canada cannot succeed unless it can show that RICO bars the application of the revenue rule. We ultimately conclude that Canada's arguments, though ably made, are unavailing.

Notwithstanding Canada's assertion that Congress was not aware of the broad scope of the revenue rule at the time of RICO's enactment, it is clear that the revenue rule was well established by that date. Therefore, as explained below, Congress is presumed to have legislated with knowledge of the rule. Approximately thirty-five years before RICO's enactment, the United States Supreme Court acknowledged the broad scope of the revenue rule. *See Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 275, 56 S.Ct. 229, 80 L.Ed. 220 (1935).[29] In addition to the authorities cited in Section I, *supra*, numerous courts and commentators professed the vitality of the revenue rule in the years leading up to the enactment of RICO.[30] It was against

---

**29.** In *Milwaukee County*, the Supreme Court held that under the Full Faith and Credit Clause each American state must enforce a tax judgment entered in any other state of the union if requested to do so. The Court distinguished the obligations of the states of the union from those of independent foreign sovereigns, which are not bound by the Full Faith and Credit Clause and which are "free to ignore obligations created under the laws or by the judicial proceedings of the others." 296 U.S. at 277, 56 S.Ct. 229.

**30.** *See, e.g., Carl Zeiss Stiftung v. V.E.B. Carl Zeiss Jena*, 293 F.Supp. 892, 913 (S.D.N.Y. 1968) (recognizing the revenue rule), *modified on other grounds*, 433 F.2d 686 (2d Cir.1970); *Newcomb v. Comm. of Internal Revenue*, 23 T.C. 954, 960, 1955 WL 703 (U.S. Tax Ct.1955) ("It is generally recognized that courts as a matter of policy decline to enforce the penal or revenue laws of a foreign jurisdiction."); *Banco Do Brasil, S.A. v. A.C. Israel Commodity Co.*, 12 N.Y.2d 371, 376–77, 239 N.Y.S.2d 872, 190 N.E.2d 235 (1963) (dismissing an action under an American statute

this understanding of the common law that in 1970 Congress enacted RICO.

We do not simply presume congressional awareness of relevant judicial decisions, although we could do so. The Senate itself has, through its actions, shown respect for the revenue rule. *See* Section I.B.2, *supra*.[31]

■■■ Principles of statutory construction require that we construe RICO in a manner that preserves the revenue rule absent clear evidence of congressional intent to abrogate it.[32] "[W]here a common-law principle is well established ... the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) (internal quotation marks and citation omitted). " 'Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.' " *In re Chateaugay Corp.*, 94 F.3d 772, 779 (2d Cir.1996) (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952)). "In such cases, Congress does not write upon a clean slate." *United States v. Texas*, 507 U.S.

---

brought by foreign government-owned bank to sue for damages allegedly caused by violation of Brazilian currency control laws); *De Sayve v. De La Valdene*, 124 N.Y.S.2d 143, 153 (N.Y.Sup.Ct.1953) (referring to "the rule that the courts of one State do not enforce the revenue laws of another"); *Cermak v. Bata Akciova Spolecnost*, 80 N.Y.S.2d 782, 785 (N.Y.Sup.Ct.1948) (same), *aff'd*, 275 A.D. 919, 90 N.Y.S.2d 680 (1st Dep't 1949); *Bowles v. Barde Steel Co.*, 177 Or. 421, 441, 164 P.2d 692 (1945) ("It is held that ordinarily a state court will not enforce the revenue laws of another ... country."); *Hearings Before Sen. Comm. on Foreign Relations, Subcomm. on Double Tax Conventions*, 82nd Cong., 1st Sess., at 69 (1951) (statement of Eldon King, Special Deputy Commissioner, Bureau of Internal Revenue) ("The point that under existing international law and rules of comity, fortified by court decisions, foreign and domestic, the United States cannot collect a tax imposed by a foreign government is readily conceded. Thus, to do so, it is necessary to incorporate collection aid in a treaty."), *available at Legislative History Vol. 1*, at 577; Alan R. Johnson, *Systems for Tax Enforcement, Treaties: The Choice Between Administrative Assessments & Court Judgments*, 10 Harv. Int'l L.J. 263, 263 (1969) ("Absent special treaty provisions, extraterritorial enforcement [of taxes] remains foreclosed by the venerable, though criticized, doctrine that one nation will not enforce the revenue laws or judgments of another."); Case Note, *Canadian Court Will Not Entertain Suit to Enforce Unit-*

*ed States Tax Judgment*, 77 Harv. L.Rev. 1327, 1327 (1964) (referring to "the traditional rule that the courts of one government will not enforce either the penal or the revenue claims of another"); Note, *International Enforcement of Tax Claims*, 50 Colum. L.Rev. 490, 491 (1950) ("[T]he judiciaries of the United States, England, and continental Europe have held that one sovereign state may not maintain an action in the courts of another for the collection of a tax claim."); Note, *Extrastate Enforcement of Penal & Revenue Claims*, 46 Harv. L.Rev. 192, 222 (1932) (discussing revenue rule).

31. Today, Congress remains alert to the revenue rule. For example, the pending Bankruptcy Reform Act of 2001 provides that the access of foreign creditors to domestic bankruptcy proceedings "does not change or codify present law as to the allowability of foreign revenue claims or other foreign public law claims in a proceeding under [the Bankruptcy Code]." 147 Cong. Rec. S2511 (March 19, 2001) (referring to S. 420).

32. The dissent focuses principally on whether the justifications for the revenue rule are currently tenable. Although, as discussed *supra*, we believe that they remain so in certain significant respects, that is not the most important issue. Rather, the fundamental question in this case is whether Congress intended to abrogate this long-standing, albeit criticized, common law rule in enacting RICO.

529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993). As discussed above, there can be no question that the version of the revenue rule under which United States courts abstain from assisting foreign sovereign plaintiffs with extraterritorial tax enforcement is a well-established part of the common law and fully consistent with our broader legal, diplomatic, and institutional framework.

■ "In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Id.; see also id.* at 540–41, 113 S.Ct. 1631 (Stevens, J., dissenting) (disagreeing as to the state of the common law, but stating that "[w]e presume that Congress understands the legal terrain in which it operates . . . and we therefore expect Congress to state clearly any intent to reshape that terrain"); *Goodkin v. United States*, 773 F.2d 19, 23 (2d Cir. 1985) (applying canon and stating that "[t]he no-fault law is a statute in derogation of the common law and, thus, must be strictly construed"). When a statute is as expansive as RICO, a court must be particularly careful to assure itself that Congress intended to abrogate the common law by enacting it. *Cf. Beck v. Prupis*, 529 U.S. 494, 504, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) ("We presume, therefore, that when Congress established in RICO a civil cause of action . . ., it meant to adopt . . . well-established common-law civil conspiracy principles."); *Neder v. United States*, 527 U.S. 1, 21–23, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (Court would interpret

federal criminal statutes which are common RICO predicate offenses to include common law limitations "unless the statute otherwise dictates" (internal quotation marks omitted)).[33]

Moreover, when an interpretation of a broad, general statute would implicate foreign relations, the Supreme Court has proceeded cautiously and looked for a clear expression of congressional intent as to the statute's scope. For example, in *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), a case about the National Labor Relations Board's assertion of jurisdiction over foreign seamen, the Court declined to read the National Labor Relations Act in a manner that would raise a serious question of separation of powers, which would in turn implicate sensitive issues of the authority of the executive over relations with foreign nations. It stated that before approving the Board's exercise of jurisdiction "there must be present the affirmative intention of the Congress clearly expressed." *Id.* at 21–22, 83 S.Ct. 671 (citation omitted). Adherence to this principle will ensure that the courts interpret RICO consistently with international law. United States courts " 'are not to read general words . . . without regard to the limitations customarily observed by nations upon the exercise of their powers.' " *In re Maxwell Communication Corp.*, 93 F.3d 1036, 1047 (2d Cir.1996) (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir.1945)).[34]

---

**33.** *See generally United States v. Bestfoods*, 524 U.S. 51, 62–63, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") cannot be read to abrogate state corporation law unless it speaks directly to the issue, which it does not); *Imbler v. Pachtman*, 424 U.S. 409, 417–18, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (federal civil rights statute did not abrogate general tort

immunities; instead, it must be interpreted in light of the immunities); *In re Chateaugay Corp.*, 94 F.3d at 779 (tax intercept statute did not abrogate common law right of setoff).

**34.** *Cf. Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 124 (2d Cir.), *cert. denied*, 531 U.S. 918, 121 S.Ct. 277, 148 L.Ed.2d 201 (2000) (a treaty will not be deemed to be abrogated unless Congress has made a clear

■ Applying these rules of construction, Canada's contention that RICO abrogates the revenue rule fails. "A party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change." *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 521, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989); *see Tome v. United States*, 513 U.S. 150, 163, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) (plurality opinion) (quoting *Green*). We respectfully conclude that Canada has not carried this burden. The language and structure of RICO and its legislative history offer no hint that Congress intended the statute to afford a civil remedy to foreign nations for the evasion of foreign taxes.[35] Moreover, there is no language in RICO or in its legislative history that demonstrates any intent by Congress to abrogate the revenue rule.[36] For the statute to change such a time-honored common law prudential rule, it must "speak directly" to the matter; yet it does not. Absent such indication, we must presume Congress understood the common law against which it legislated and intended that this common law doctrine should co-exist with the RICO statute.

Legislation passed since RICO's 1970 enactment reinforces our conclusion that Congress did not intend to reach foreign tax law violations and thereby abrogate the revenue rule through civil RICO. In 1978, Congress outlawed trafficking in contraband cigarettes with the aim of reducing evasion of state cigarette taxes, and amended RICO to include such trafficking as a predicate offense. *See* 18 U.S.C. §§ 1961(1)(B), 2341–2346. Although Congress knew that the "purchase of cigarettes through tax-free outlets include[d] cigarettes obtained from three primary sources: international points of entry, military post exchanges, and Indian reservations," S. Rep. 95–962, at *6 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5518, 5520, and that "[t]here [was] widespread traffic in cigarettes moving in or otherwise affecting interstate or foreign commerce," H.R. Conf. Rep. 95–1778, at *7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5535, 5536, Congress did not prohibit smuggling between countries or in violation of foreign tax laws. *See* 18 U.S.C. §§ 2341(2), (4).

We are aware that RICO is a broad statute, and that the Supreme Court has often rejected attempts to limit the reach of its provisions through judicially-created narrowing constructions. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (" '[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.

expression that it intends to override its protections); *Maxwell Communication*, 93 F.3d at 1047 (" '[A] statute ought never to be construed to violate the law of nations, if any other possible construction remains.' ") (quoting *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) (Marshall, C.J.)).

35. Congress could have chosen to afford a remedy for this conduct with RICO, had it so desired. At the time of RICO's passage, it was well known that organized crime organizations engaged in tax evasion and smuggling. *See, e.g.,* Thomas Svogun, *Cigarette Bootlegging: The Problem, Civil & Criminal Remedies*, in 1 Materials on RICO 241, 245–54 (G. Robert Blakey ed., 1980) (describing reports of cigarette smuggling in 1960s and 1970s).

36. Neither the parties nor the dissent have cited, and our research has not revealed, any statements about the revenue rule in RICO's extensive legislative record. *Cf. Illinois Dep't of Revenue v. Phillips*, 771 F.2d 312, 317 (7th Cir.1985) (noting that RICO's legislative history is "silent" on whether a state department of revenue can use RICO to punish tax evasion).

It demonstrates breadth.' ") (citation omitted). One key difference in the instant case is that we are emphatically *not* dealing here with a situation "not ... anticipated by Congress." As we have demonstrated, Congress was and is aware of the revenue rule, the precise extent of extraterritorial enforcement assistance available under our tax treaties, and the existence of cigarette smuggling in violation of foreign tax laws. In spite of the extensive Congressional attention to these areas, we are not cognizant of any manifestation of Congressional intent that civil RICO and the United States courts should be available to a foreign sovereign seeking to recover lost tax revenues.

37. *See Banco Frances e Brasileiro S.A. v. Doe*, 36 N.Y.2d 592, 601–02, 370 N.Y.S.2d 534, 331 N.E.2d 502 (1975) (Wachtler, J., dissenting) ("Accordingly, the result is not determined by the threshold appearance of the particular law sought to be enforced or whether such law be denominated by the foreign government as a penal law or revenue law or otherwise. The bottom line is that the courts of one country will not enforce the laws adopted by another country in the exercise of its sovereign capacity for the purpose of fiscal regulation and management."); *see generally* F.A. Mann, *Prerogative Rights of Foreign States & the Conflict of Laws, in Studies in International Law* 502 (1973) ("It is equally certain that in ... matters [of prerogative rights] the court will not allow itself to be misled by appearances: on the contrary, it will investigate whether what the plaintiff asserts is in substance a prerogative right the direct or indirect enforcement of which is being sought.").

38. In *Peter Buchanan*, the Irish High Court explained:

> Those cases on penalties would seem to establish that it is not the form of the action ... that must be considered, but the substance of the right sought to be enforced; and that if the enforcement of such right would even indirectly involve the execution of the penal law of another State, then the claim must be refused. I cannot see why the same rule should not prevail where it

### III. Direct and Indirect Enforcement under the Revenue Rule

As an initial matter, we note again that Canada is not asking for the enforcement of a final, fully adjudicated Canadian tax judgment, but rather, for a United States court to assess and adjudicate the application of Canadian tax laws to the wrongdoing alleged in its complaint. When presented with such a request which potentially implicates the revenue rule, a court must examine whether the substance of the claim is, either directly or indirectly, one for tax revenues.[37] What matters is not the form of the action, but the substance of the claim.[38] For example, in *United States v. Harden*, [1963] S.C.R.

> appears that the enforcement of the right claimed would indirectly involve the execution of the revenue law of another State, and serve a revenue demand.... In each case it is sought to enforce a personal right, but as that right is being enforced at the instigation of a foreign authority, and would indirectly serve claims of that foreign authority of such a nature as are not enforceable in the courts of this country, relief cannot be given.

*Peter Buchanan L.D. v. McVey*, [1955] A.C. 516, 527 (Ir.H.Ct.1950), *aff'd*, [1955] A.C. 530 (Ir.S.C.1951); *see Sydney Municipal Counsel v. Bull*, [1909] 1 K.B. 7, 12 (quoted in *Peter Buchanan*, [1955] A.C. at 525) ("Some limit must be placed upon the available means of enforcing the sumptuary laws enacted by foreign States for their own municipal purposes.... The action is in the nature of an action for a penalty to recover a tax; it is analogous to an action brought in one country to enforce the revenue laws of another. In such cases it has always been held that an action will not lie outside the confines of the last-mentioned State."); *QRS 1 APS v. Frandsen*, [1999] 3 All E.R. 289, 291 (C.A.) ("It is a fundamental principle of English law that our courts will not directly or indirectly enforce the penal, revenue or other public laws of another country. On the English authorities it is clear that the present action falls foul of that rule: in substance it involves the indirect enforcement of Denmark's revenue law." (internal citation omitted)).

366, 371 (Can.), the Canadian Supreme Court rejected the enforcement of a stipulation of settlement of a tax case as barred by the revenue rule, stating that "[n]either the foreign judgment nor the agreement does more than make certain the fact and the amount of the respondent's liability to the appellant. The nature of the liability is not altered. It is a liability to pay income tax." The Court concluded: " 'For the purpose of this case it is sufficient to say that when it appears to the court that the whole object of the suit is to collect tax for a foreign revenue, and that this will be the sole result of a decision in favour of the plaintiff, then a court is entitled to reject the claim by refusing jurisdiction.' " *Id.* at 372–73 (quoting *Peter Buchanan,* [1955] A.C. at 529).

Canada argues to this Court that "[n]othing in the revenue rule, . . . prohibits a foreign nation from bringing a suit in the United States to enforce rights established *under United States law.* This is not an attempt by Canada to assert its sovereignty extraterritorially; it is not a claim to enforce Canadian tax law or any other Canadian law." We are not persuaded by Canada's arguments that this is an action brought solely under United States law, and not a claim for Canadian taxes. On the contrary, Canada seeks to use the United States law to enforce, both directly and indirectly, its tax laws.[39]

As to direct enforcement, Canada alleges that "[d]efendants evaded the payment of customs and excise tax and duty owed directly to Canada. This evasion was a direct cause of lost revenue to Canada. . . . Defendants' conduct forced Canada to roll back tobacco taxes in 1994, resulting in

lost revenue into the future." As the Canadian Supreme Court said in *Harden,* we must look to the "object" of the claim. When we do so, we see that, at bottom, Canada would have a United States court require defendants to reimburse Canada for its unpaid taxes, plus a significant penalty due to RICO's treble damages provision. Thus, Canada's object is clearly to recover allegedly unpaid taxes.

We also conclude that Canada's claim for damages based on law enforcement costs is in essence an indirect attempt to have a United States court enforce Canadian revenue laws, an exercise barred by the revenue rule. *See* 1 Dicey & Morris, *The Conflict of Laws* 91 (13th ed. 2000) ("Indirect enforcement occurs where a foreign State (or its nominee) in form seeks a remedy, not based on the foreign rule in question, but which in substance is designed to give it extra-territorial effect. . . ."). As to law enforcement costs, Canada states:

> Defendants' role in smuggling caused Canada to increase enforcement and investigative resources. But for Defendants' active involvement in smuggling, Canada would not have had to dedicate as many resources to combat smuggling. The predictable outcome of Defendants' evasion of United States and Canadian laws, and concealment of such evasion, was to cause Canada to spend further resources attempting to discover the culprits of its injury.

Canada attempts to analogize its injury of additional law enforcement costs incurred to the harms suffered by private victims of RICO schemes: "Canada incurred specific additional law enforcement costs not as

---

**39.** In any event, we do not understand how a formalistic distinction between an action based explicitly and entirely on Canadian law and one which, in effect, pleads violations of Canadian law through the medium of a Unit-

ed States statute, is a response to the concerns outlined above about, *inter alia,* judicial non-interference with international tax policy-making by the political branches.

part of its normal policing, but in self-defense because it was under direct attack by defendants.... No different result should obtain merely because the RICO scheme was more ambitious and the intended victim was a sovereign nation that was forced to combat the illegal conduct with special enforcement resources."

We disagree. The primary purpose identified by Canada for using its police forces to stop the smuggling was to enforce its customs and excise taxes. In effect, Canada is requesting that defendants pay the salary of the tax enforcers; such police costs are thus derivative of the taxes Canada sought to enforce. We do not believe that the mechanism for the enforcement of a tax law can be so easily separated from the tax law itself. It would certainly be anomalous for the Court to permit the collection of the law enforcement costs while holding that the object of those law enforcement efforts was uncollectable. Particularly in light of the separation of powers and foreign relations concerns discussed above, we must decline to allow Canada to indirectly enforce its revenue laws simply by pleading

tort damages based on the costs of enforcing those laws.

Canada's argument depends on the contention that the expenditure of resources by a private individual can be equated with the expenditures of a nation.[40] By their very nature, sovereigns, unlike individuals, have at their disposal state-funded and state-maintained resources—such as the services of the Canadian Attorney General and the Royal Canadian Mounted Police—to combat a RICO scheme. The sovereign has a legal monopoly on the use of this type of coercive power. *See generally* Max Weber, *The Theory of Social & Economic Organization* 156 (Talcott Parsons ed., 1947). Law enforcement costs incurred to secure taxes for the sovereign are qualitatively different from the damages suffered by a private individual; they fall within the class of acts that are *"jure imperii,"* that is, that are expressions of a foreign sovereign's will or are carried out by virtue of that sovereign authority. *See Attorney General of New Zealand v. Ortiz,* [1984] A.C. 1, 20–21 (H.L.). United States courts have traditionally been reluctant to enforce foreign laws that are *"jure imperii."* [41]

**40.** The district court held that the law enforcement costs were barred under *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (1990), which stated in dicta that a government's additional law enforcement costs were not recoverable under RICO. *See Attorney General of Canada v. RJ Reynolds Tobacco Holdings, Inc.,* 103 F.Supp.2d 134, 151–55 (N.D.N.Y.2000); *see generally* Anne Giddings Kimball & Sarah L. Olson, *Municipal Firearm Litigation: Ill Conceived from Any Angle,* 32 Conn. L.Rev. 1277, 1296–1301 (2000) (describing the municipal cost recovery rule which precludes government's recovery in a civil action for the cost of public services); *City of Philadelphia v. Beretta U.S.A. Corp.,* 126 F.Supp.2d 882, 894–95 (E.D.Pa.2000) (same). Canada distinguishes the present case from *Town of West Hartford* on the ground that in this case, Canada was the intended victim of defendants' scheme,

while in *Town of West Hartford,* the town was not the defendants' target, but instead used its police to aid the abortion clinic that was the defendants' target. We need not address this issue on appeal, and do not decide whether, under different circumstances, such costs would be available to a government that was the intended victim of a RICO scheme.

**41.** Under international law, a sovereign's acts may be classified in two groups. "One class comprises those acts which are done by a sovereign 'jure imperii,' that is, by virtue of his sovereign authority. The others are those which are done by him 'jure gestionis,' that is, which obtain their validity by virtue of his performance of them." *Ortiz,* [1984] A.C. at 20–21; *see Saudi Arabia v. Nelson,* 507 U.S. 349, 359–60, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (noting that under the restrictive theory of absolute immunity, "a state is immune

Additional considerations reinforce our determination that Canada's claim for law enforcement costs must be dismissed. To proceed with the law enforcement costs claim, we would have to examine the tax laws at issue in order to assess the causation aspect of this claim. For example, we would have to assess whether the law enforcement costs were in fact spent on achieving the cessation of cigarette smuggling. So doing, we would have to examine whether, when and to what extent the smuggling existed, which would require a determination that tax laws were applicable to defendants. These inquiries could draw the courts into troubled waters.

Canada emphasizes that recent thinking with regard to the revenue rule has admitted a distinction between the "enforcement" and the "recognition" of revenue laws, and argues that it seeks only recognition, not enforcement, of its laws. In particular, Canada asserts that the revenue rule may prohibit the enforcement of Canadian tax laws, but not their recognition in order to calculate damages. *See* 1 Dicey & Morris at 90 (revenue rule "relates only to *enforcement*, but it does not prevent *recognition* of a foreign [revenue]

law.") (emphasis in original). Canada relies on two pairs of cases to support this position. First, Canada draws a parallel between the present case and those in which United States courts calculating sentences have considered foreign sovereigns' lost tax duties as a measure of damages caused by criminal activity. *See, e.g., United States v. Chmielewski,* 218 F.3d 840, 843 (8th Cir.2000). This argument is unavailing. As explained above, *see* Section I.B.4, *supra,* criminal cases do not raise the same issues as those implicated by the instant civil suit by Canada.

Second, Canada cites in *In re State of Norway's Application (Nos. 1 and 2),* [1990] A.C. 723, 724 (H.L.), in which an English court held that the revenue rule did not bar an application by Norway to gather evidence in England for use in tax proceedings in Norway, and *Regazzoni v. K.C. Sethia (1944) Ltd.,* [1956] 2 Q.B. 490, 515–16 (C.A.), *aff'd,* [1957] 3 All E.R. 287 (H.L.), where an English court held that the rule against enforcing foreign political laws did not require it to enforce a contract that violated Indian laws against export to South Africa.[42] In both of these

---

from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii* ), but not as to those that are private or commercial in character (*jure gestionis* )"); *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 711, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (same). An example of a private, *"jure gestionis"* act is operating a business. In addition to the enforcement of revenue laws, a classic example of *"jure imperii"* acts is the enforcement of penal laws. *See Nelson,* 507 U.S. at 361, 113 S.Ct. 1471 ("a foreign state's exercise of the power of its police has long been understood ... as particularly sovereign in nature"). As with revenue rules, American courts have generally refrained from enforcing the penal laws of foreign sovereigns. *See Huntington v. Attrill,* 146 U.S. 657, 673–74, 13 S.Ct. 224, 36 L.Ed. 1123 (1892) ("The question whether a statute of one state, which in some aspects may be called penal, is a

penal law, in the international sense, so that it cannot be enforced in the courts of another state, depends upon the question whether its purpose is to punish an offense against the public justice of the state, or to afford a private remedy to a person injured by the wrongful act."); *The Antelope,* 23 U.S. (10 Wheat.) 66, 123, 6 L.Ed. 268 (1825) (Marshall, C.J.) ("The Courts of no country execute the penal laws of another. . . ."). Thus, the bar on the extra-national enforcement of revenue laws is just one aspect of a cautionary approach of domestic courts to enforcing foreign laws that are *"jure imperii."*

42. Lord Denning explained:

These courts will not enforce [revenue or penal] laws at the instance of a foreign country. It is quite another matter to say that we will take no notice of them. It seems to me that we should take notice of

cases, the court permitted recognition but not enforcement of foreign revenue laws. However, in neither *Norway* nor *K.C. Sethia* was the British court called upon to allow damages that would serve as a substitute for previously unpaid taxes to be paid in the United Kingdom to a foreign sovereign. Moreover, in the *K.C. Sethia* case, a foreign sovereign did not come to Britain for relief; rather, private parties sought the court's assistance to resolve a commercial dispute, as the House of Lords noted when Viscount Simonds stated that "in consideration of this matter I deem it of the utmost importance to bear in mind that we are not here concerned with a suit by a foreign state to enforce its laws." *K.C. Sethia*, [1957] 3 All E.R. at 289.[43] In the present case, the taxes would be enforced by a United States court if Canada were successful. Similarly, in *In re Reid*, [1970] D.L.R.3d 199, 205 (B.C.Ct.App.), the Canadian court relied on the distinction between recognition and enforcement when it allowed the trustee of an estate to be indemnified for having paid a foreign tax claim out of the estate, stating:

> In every one of the cases ... referred to, success would have enriched the treasury of the interested State. In the

> the laws of a friendly country, even if they are revenue laws or penal laws or political laws, ... at least to this extent, that if two people knowingly agree to break the laws of a friendly country or to procure some one else to break them or assist them in the doing of it, then they cannot ask this court to give its aid to the enforcement of their agreement.
>
> *K.C. Sethia*, [1956] 2 Q.B. at 515. We note that the *K.C. Sethia* case involved a political law, not a revenue law, and thus presented different considerations than the present case does. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 414 & n. 16, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (noting that doctrine against applying public laws other than revenue and penal laws "may have a broader reach in Great Britain" than in the United States).

case at bar, whether or not the trustee is indemnified cannot affect to the slightest degree the amount of estate duty collected in England.... Here the United Kingdom has nothing whatever to do with the respondent's claim to be indemnified.

Accordingly, the cases cited by Canada are inapposite and do not undermine our conclusion that all of Canada's claims are barred by the revenue rule.

## Conclusion

To the extent that the allegations set forth in Canada's complaint are correct, we understand Canada's frustration that it cannot recoup its lost revenue and law enforcement costs against defendants that allegedly committed most of their wrongdoing on our side of the common border with Canada. No court wishes to find itself in the position of being unable to right an alleged wrong. *See Loucks v. Standard Oil Co. of New York*, 224 N.Y. 99, 111, 120 N.E. 198 (1918) (Cardozo, J.). Nonetheless, we are without license to abandon unilaterally the centuries-old, albeit sharply-attacked, revenue rule. "The hard fact is that sometimes we must make

**43.** It seems clear the House of Lords recognized a difference between enforcement by a foreign sovereign as compared to private claims brought by individuals affected by tax laws, as Lord Denning stated in *K.C. Sethia:*

> It seems to me that Lord Mansfield [in *Holman v. Johnson*] goes too far when he says that these courts will *take no notice* of such [penal or revenue] laws. It is perfectly true that the courts of this country will not enforce the revenue laws or the criminal laws of another country at the suit of that country, either directly or indirectly. These courts do not sit to collect taxes for another country or to inflict punishments for it.... These courts will not enforce such laws at the instance of the foreign country.
>
> *K.C. Sethia*, [1956] 2 Q.B. at 515.

decisions we do not like" because the laws "compel the result." *Texas v. Johnson*, 491 U.S. 397, 420–21, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (Kennedy, J., concurring). "When and if the [revenue] rule is changed, it is a more proper function of the policy-making branches of our government to make such a change." *Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson*, 597 F.2d 1161, 1166 (9th Cir.1979). Recourse, to the degree it is warranted and available, lies with the executive and legislature.

Because the judgment is affirmed based on the revenue rule, we need not address the other grounds discussed by the district court or raised by the parties on appeal.[44]

CALABRESI, Circuit Judge (dissenting).

On its face, and despite the considerable confusion created by defendants' able arguments, the revenue rule has nothing to do with this case. As described by the relevant Restatement, the rule provides only that "[c]ourts in the United States are not required to recognize or to enforce judgments for the collection of taxes, fines, or penalties rendered by the courts of other states." Restatement (Third) of Foreign Relations Law § 483 (1987). The majority describes the rule in a similar fashion: "The revenue rule is a longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." Majority Op. at 109. It is manifest that the suit before us in no way requires our courts to enforce foreign judgments or claims; it simply is an action for damages provided for and brought under federal law. Nevertheless, the majority invokes the revenue rule to

bar the suit. Because I do not think the rule applies and because none of the possible rationales for the rule supports its extension to the facts in this case, I respectfully dissent.

The majority's description of Canada's suit makes clear that this action arises from a violation of a United States statute, namely the civil enforcement provision of RICO, 18 U.S.C. § 1964(c), which itself creates the cause of action. "Canada alleges that defendants violated RICO by ... repeated instances of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1962(c). Second, Canada alleges a conspiracy, in violation of 18 U.S.C. § 1962(d), to violate subsections (a), (b) and (c) of section 1962." Majority Op. at 107–08 (footnote omitted). The Canadian tax laws come into play only indirectly, as a factor to be used in the calculation of damages, and do so entirely because the RICO statute itself makes the Canadian laws relevant to that calculation. Thus RICO states that, in the calculation of damages, "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit...." 18 U.S.C. § 1964(c). It follows that Canada, in suing for damages resulting from the violation of a United States statute, neither is seeking to have non-Canadian courts enforce Canadian judgments, laws, or policies, nor is basing this action on the violation of the Canadian statute.

Undaunted by this fact, the majority seeks to justify its position by undertaking an extended examination of the supposed

---

**44.** We express our appreciation for the excellent submissions made by the parties and *amici curiae.*

**136**

functions served by the revenue rule, with the result that the rule is greatly expanded in its scope, and, indeed, would seemingly be applicable whenever a foreign country seeks to recover government funds.[1] But in fact, the functions of the revenue rule either are not served at all by foreclosing this action or are furthered in ways that this Circuit has already held do not justify application of the revenue rule. *See United States v. Pierce,* 224 F.3d 158, 167 (2d Cir.2000); *United States v. Trapilo,* 130 F.3d 547, 552–53 (2d Cir.1997).

The majority cites three major bases for the revenue rule, each of which I shall examine in the context of the case before us.

### I

The first argument has to do with a reluctance to permit, much less promote, extraterritorial effect of foreign laws. In this view, the revenue rule acts as a bar against the assertion of foreign sovereignty within domestic borders. This position probably represents the original basis for the rule.[2] It is also the rationale given by Justice White dissenting in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), in which he explained that "no country has an obligation to further the governmental interests of a foreign sovereign." *Id.* at 448, 84 S.Ct. 923.

I have no argument with Justice White, and agree (a) that no country has this

obligation and (b) that the determination of such an obligation (should this country desire to advance foreign interests) is not for the courts but for the legislative and executive branches. This concern for extra-territoriality, however, has no meaning whatever when what is enforced by imposing damages or penalties is, in fact, a domestic law, that is, a law enacted by the legislative and executive branches of our country.[3] And, what Canada alleges in this suit is a violation of the RICO statute.

As a court, we have no obligation to further Canada's sovereign interests. But we do have an obligation to further America's sovereign interests. That is, we are bound to entertain suits brought under federal statutes, and to award the damages that such statutes establish. In enacting RICO and its civil enforcement provision, Congress chose to create this action. It follows that, by enacting RICO, our government has determined that this suit advances *our own* interests, and any collateral effect furthering the governmental interests of a foreign sovereign is, therefore, necessarily incidental. *See Trapilo,* 130 F.3d at 553 ("Whether our decision today indirectly assists our Canadian neighbors in keeping smugglers at bay or assists them in the collections of taxes, is not our Court's concern.")

### II

The majority's second argument supporting the rule relates to separation of

---

**1.** The majority appears to accept the district court's conclusion that Canada has standing to bring a civil RICO suit. Given that the result of such a suit would be money damages, which would provide income for the foreign government, one wonders whether, under the majority's reasoning, any suit brought by Canada would be permissible under the revenue rule. And yet, if Congress intended Canada to have standing to bring a

civil RICO suit, then it must not have understood the revenue rule to bar all such actions.

**2.** *See* Majority Op. at 111–12.

**3.** It is unlikely that the rationale applies even when the domestic law is a domestic common law rule—i.e. state common law fraud. It certainly does not apply when the domestic law being enforced by our courts is both statutory and federal.

powers, foreign policy, and court competency concerns. It focuses on the idea that enforcement of particular foreign laws by American courts may not reflect United States policy—and, in any event, does not represent that policy as formulated by an appropriate branch of government. But this concern is once again misplaced whenever the legislative and executive branches have created the cause of action. Under the circumstances, the courts cannot be said to be formulating foreign policy, they are simply implementing the policy established by the other branches.

An analogy to the enforcement of foreign judgments is apt. Generally speaking, foreign judgments are not directly enforceable in United States courts because of foreign policy and separation of powers concerns. *See, e.g., Moore v. Mitchell,* 30 F.2d 600, 604 (2d Cir.1929) (Hand, J., concurring). But, the moment treaties or laws are enacted that provide for the enforcement of certain foreign judgments, the situation changes. United States courts can thereafter enforce these judgments and must do so regardless of whether our foreign policy favors or disfavors the specific judgment before the court. Similarly, though foreign tax laws cannot be enforced directly, when American law renders an activity—including the violations of foreign tax laws—an American tort or crime, the issues of whether our foreign policy favors or disfavors the particular form of taxation involved or the choice of items to be taxed must disappear. As the Supreme Court has explained, the purpose of civil RICO is "not merely to compensate victims but to turn them into prosecutors, "private attorneys general," dedicated to eliminating racketeering ac-

tivity." *Rotella v. Wood,* 528 U.S. 549, 557, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). "The aim is to divest the association of the fruits of its ill-gotten gains." *United States v. Turkette,* 452 U.S. 576, 585, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). To reject the application of civil RICO to the case at hand is to hamper this congressional objective.

## III

The third argument relied on by the majority is, to my way of thinking, the only one that is at all germane. It was suggested by Judge Learned Hand in *Moore,* 30 F.2d at 604, and is based on the alleged difficulty involved in figuring out the meaning and significance of some foreign laws—especially foreign tax laws. As such, it is directly relevant to this suit, given the fact that, in the instant case, the damages to be assessed under RICO are to be calculated on the basis of the revenue that Canada has lost.

This rationale suggests that we should try to avoid determining the degree to which certain foreign laws have been violated. And, in this view, statutory interpretation of foreign laws is beyond the purview of the courts of this country—not because such interpretation involves extraterritoriality or because it infringes on the domain of other governmental bodies, but for the pragmatic reason that it is very complicated. This concern, in other words, suggests a practical obstacle to the suit before us because the suit, to calculate damages, requires just such an analysis. *Cf. id.*

Whatever the possible merits of this argument,[4] this Circuit has rejected it. At

---

4. The argument is, to put it mildly, dubious in a global economy, which requires a great amount of interpretation of foreign laws. *E.g., Trapilo,* 130 F.3d at 550 n. 4 ("In an age

when virtually all states impose and collect taxes and when instantaneous transfer of assets can be easily arranged, the rationale for not recognizing or enforcing tax judgments is

least that is the lesson that I draw from *United States v. Trapilo,* 130 F.3d 547 (2d Cir.1997), and *United States v. Pierce,* 224 F.3d 158 (2d Cir.2000). *Trapilo* presented the question of whether a scheme (essentially identical to the one before us) to defraud the Canadian government of tax revenue is cognizable under the federal wire fraud statute, 18 U.S.C. § 1343. *Trapilo,* 130 F.3d at 548. We there held that "[t]he statute neither expressly, nor impliedly, precludes the prosecution of a scheme to defraud a foreign government of tax revenue, and the common law revenue rule, inapplicable to the instant case, provides no justification for departing from the plain meaning of the statute." *Id.* at 551. But in *Trapilo,* because the statute prohibited schemes to defraud regardless of their success, we assumed that we could find a violation without delving into the intricacies of Canadian law. *Id.* at 552–53. As a result, we avoided confronting Judge Hand's concerns.

In *Pierce,* however, a case involving essentially the same question, we addressed those concerns and necessarily rejected them. The *Pierce* court held that "[t]o prove the existence of a scheme to defraud the Canadian government the prosecution had to prove the existence of [the property] right." *Pierce,* 224 F.3d at 165. That is, the court held that the prosecution had to prove the existence of a duty imposed by the Canadian government so that there

would be a "property right—a right to revenue—of which the Canadian government could be defrauded." *Id.* at 166. What is more, if a conviction is obtained—as *Pierce* clearly allows—the sentencing guidelines require that the sentence imposed be based on the amount of tax revenue lost.[5] In other words, the guidelines make necessary precisely the same degree of involvement with, and interpretation of, Canadian law that the case before us entails. *Pierce, Trapilo,* and the guidelines mandate this degree of involvement in order to determine the existence of a RICO crime and the proper sentence for that crime (i.e., the criminal penalty). The instant case does so in order to determine the existence of a RICO civil action and to calculate the proper damages under that action (i.e., the civil penalty). ·

As a result, I must conclude that the rationale for the revenue rule that is based on the desire to avoid analysis of foreign statutes has been effectively rejected by our court. *Trapilo* permitted a criminal charge to be brought for the very same underlying behavior as is involved in the case before us. *Pierce* required that we know in detail the nature of the foreign tax laws to make out that criminal charge. And, the sentencing guidelines make necessary that, after a conviction for actions like those charged here, the amount of revenue lost be calculated. If American courts can look to and examine the foreign

largely obsolete." (quoting *Restatement* § 483)); *Banco Frances e Brasileiro S.A. v. Doe,* 36 N.Y.2d 592, 370 N.Y.S.2d 534, 538, 331 N.E.2d 502 (1975) (commenting that "much doubt has been expressed that the reasons advanced for the rule, if ever valid, remain so ... in light of the economic interdependence of all nations ....") *cert. denied,* 423 U.S. 867, 96 S.Ct. 129, 46 L.Ed.2d 96 (1975). *See also* Roger J. Miner, *The Reception of Foreign Law in the U.S. Federal Courts,* 43 Am. J. Comp. L. 581, 586 (1995) (decrying the reluctance of federal courts to interpret

foreign law in a global economy and stating that "federal courts have shown a commendable ability to get their hands around foreign law when fully briefed on the issues").

5. Under the sentencing guidelines, the offense level will usually be determined by the offense level of the underlying conduct. U.S.S.G. § 2E1.1. If, as here, the underlying conduct is wire fraud, the offense level increases based on the amount of money lost. U.S.S.G. § 2F1.1.

statute for criminal RICO purposes, there is no reason why the same courts must be deemed incompetent to undertake an identical analysis in civil RICO cases. It follows that the majority's third rationale for the revenue rule cannot, at least in this Circuit, provide support for applying the rule to this case.

In light of *Pierce* and *Trapilo*, the majority, understandably, tries to assert differences between civil and criminal RICO actions. But this approach founders in the face of the Supreme Court's consistent refusal to treat criminal and civil RICO actions differently.[6] It also fails because there is no basis in the revenue rule itself for treating criminal and civil cases differently.

Surprisingly, in trying to make a distinction between civil and criminal RICO cases, for revenue rule purposes, the majority states that it finds the First Circuit's reasoning in *United States v. Boots*, 80 F.3d 580 (1996) "persuasive with respect to the present civil suit." Majority Op. at 123. But in *Boots*, the First Circuit held that the revenue rule barred a *criminal* action involving deprivation of the tax revenue of a foreign nation. And, in its holding, the *Boots* court derided the civil-criminal distinction (purportedly based on the existence of prosecutorial discretion) that the majority seeks to use in this case. The *Boots* court noted that "[p]rosecutors, who operate within the executive branch, might of course be expected not to pursue wire fraud prosecutions based on smuggling schemes aimed at blatantly hostile countries, but whether conduct is criminal cannot be a determination left solely to prosecutorial discretion." *Boots*, 80 F.3d at 588. No, *Boots* did not, and could not, rest on a civil-criminal distinction (based on prosecutorial discretion) that the Supreme Court has uniformly rejected. It relied, instead, for its prohibition of criminal RICO actions, on the very same Learned Hand rationale that we rejected in *Pierce* and *Trapilo*, two cases which, moreover, in re-

---

**6.** The Court made clear that it would not interpret civil RICO narrowly in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The Court noted that its broad interpretation of civil RICO "is amply supported by our prior cases and the general principles surrounding the statute.... This is the lesson not only of Congress's self-consciously expansive language and overall approach, ... but also of its express admonition that RICO is to 'be literally construed to effectuate its remedial purposes.'" *Id.* at 497–98, 105 S.Ct. 3275 (citation omitted) (quoting Pub.L. 91–452 § 904(a), 84 Stat. 947). The Court further explained: "The statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity.... RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime.... While few of the legislative statements about novel remedies and attacking crime on all fronts ... were made with direct reference to § 1964(c), it is in this spirit that all of the Act's provisions should be read."

*Id.* at 498, 105 S.Ct. 3275 (citations omitted). The Court noted the concern of the Court of Appeals over the uses to which civil RICO was being put but explained that these uses are "hardly a sufficient reason for assuming that the provision is being misconstrued." *Id.* at 499, 105 S.Ct. 3275 The Court stressed the expansive take it had on civil RICO by noting: " '[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.' " *Id.* (quoting *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 747 F.2d 384, 398 (7th Cir.1984) (alteration in original)). *See also, e.g., H.J. Inc. v. Northwestern Bell Tel., Co.*, 492 U.S. 229, 236, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (commenting that the breadth of the predicate offenses and Congress's failure to interpret the term "pattern" in the statute applies to criminal and civil applications of the Act); *Sedima*, 473 U.S. at 493, 105 S.Ct. 3275 (rejecting a restrictive interpretation of § 1964(c) that would have made a criminal conviction a prerequisite for a civil RICO suit).

jecting that rationale, self-consciously declined to follow *Boots.* *Pierce,* 224 F.3d at 164; *Trapilo,* 130 F.3d at 549.

## IV

In the end, all the arguments based on the revenue rule's functions apply, if at all, with equal force in both the criminal and civil context. The first two have no meaning when the cause of action—whether criminal or civil—is based on American laws. The third—the desire to avoid interpretation of complex foreign laws—has little merit in the complex global economy. And it has, in any event, effectively been rejected in this circuit by *Trapilo* and *Pierce* because its rationale would as fully preclude criminal convictions followed by sentences based on Canada's revenue losses, as it would civil suit damage awards that use those losses as the basis for calculating the civil sanctions.[7]

All that being said, I fully share the majority's concerns that applying civil RICO to violations of foreign tax laws may be harmful to American trade interests and to American companies doing business abroad. And, I do not deny that the absence in civil cases of prosecutorial discretion removes one possible means by which such American companies can avoid domestic sanctions for some foreign mis-

deeds that many here might not wish to punish. But, this problem is in no way limited to, or especially severe with respect to, behavior that might be insulated from punishment through a revivification and expansion of the revenue rule. The problem derives, instead, from the extraordinary scope of the RICO statute (the wisdom of whose breadth one may well doubt),[8] and from the Supreme Court's repeated unwillingness to distinguish between civil and criminal RICO, thereby declining to make use of prosecutorial discretion as a way of limiting RICO's breadth.

In this respect, I note my own discomfort with various aspects of RICO, and especially of civil RICO. I would not be displeased if the Supreme Court, faced with the possible effects of civil RICO in a case like this one, were to retreat from its insistence on an identical scope for civil and criminal RICO. Similarly, I would welcome a reconsideration by Congress of how far civil RICO ought to go.[9] As a Court of Appeals judge, I cannot, however, join an opinion that applies an old and dubious common law rule, in ways that have nothing to do with its roots or rationales, in order to limit an act of Congress that the Supreme Court has repeatedly applied in the broadest possible ways.[10]

---

7. Notably in both the civil and criminal context, the lost tax revenue does not itself constitute the penalty exacted. Instead, the fine, jail time, or damages assessed simply use the lost revenue as a factor to be employed—after appropriate multiplication, etc.—to determine the size of the civil or criminal penalties to be imposed.

8. As the Supreme Court has noted, the civil and criminal remedies taken together mean that "RICO provides for drastic remedies." *H.J. Inc.,* 492 U.S. at 233, 109 S.Ct. 2893.

9. In support of its holding that civil RICO suits against "legitimate" business enterprises were permissible in addition to those brought

against organized crime organizations, the Supreme Court stated: "Yet this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress. It is not for the judiciary to eliminate the private action in situations where Congress has provided it...." *Sedima,* 473 U.S. at 499–500, 105 S.Ct. 3275.

10. The majority characterizes the issue in this case as whether Congress intended to abrogate the revenue rule when it passed RICO. As is apparent from my dissent, I view the issue differently. For me, the question is whether Congress, in RICO, created a cause of action giving rise to damages, and did so

For these reasons, I, regretfully and respectfully, dissent.

without regard to the existence of the revenue      rule.